# Court of Appeals.

February 25, 1896.

## PEOPLE v. MARTIN V. STRAIT.

**1. EVIDENCE—NONEXPERT.**

Nonexperts, after testifying to facts and incidents in relation to a person tending to show soundness or unsoundness of mind, may testify to the impression produced upon them thereby, and as to whether the acts and declarations testified to impressed them as rational or irrational; but they cannot be permitted to give an opinion as to the general soundness or unsoundness of mind of the person, or as to his mental capacity.

**2. SAME—EXPERT.**

An expert witness cannot give an opinion as to the mental condition of a person, based upon statements made to him by such person not in evidence.

**3. SAME.**

Nor is the opinion of such witness admissible when based upon statements made by the defendant long after the commission of the criminal act.

**4. SAME—INSANITY.**

Upon the trial of an indictment for murder of accused's wife, where defense is insanity, claimed to have been caused by a separation from her, evidence of defendant's living with a sporting woman, while separated from a former wife, from whom he was afterwards divorced, is not admissible, as bearing upon his regard for the marriage relation and the effect of the separation from a second wife upon his mind.

Appeal from a judgment convicting defendant of murder.

H. H. Rockwell, for appellant.

Chas. H. Knipp, Dist. Atty., for the People.

HAIGHT, J.—The defendant, Martin V. Strait, was 54 years of age, a miller by occupation, of large and muscular build, well-informed, and intelligent. He married when 19 years of age, and had three sons, now grown to manhood. About 10 years ago he separated from his wife, and subsequently procured a divorce. He then married Jean H. Calkins, with whom he lived for about six years, and until September 16, 1894, when she left him, and went to reside with her sister, Mrs. Whitford, at No. 104 East Hudson street, in the city of Elmira. It appears that a reconciliation was effected, and that they lived together for about two weeks, when they again separated. Mrs. Whitford had taken sides in the family difficulty, and the defendant believed her to be the cause of the estrangement and separation of his wife from him. Further attempts were made to settle their differences, and numerous letters were written between them during the latter part of October and the fore part of November following their second separation, but they failed to become reconciled. In the afternoon of the 16th day of November, 1894, Mrs. Strait and Mrs. Whitford were at the corner of Lake and Water streets, in the city of Elmira. They went up Water street, and entered a lawyer's office, where they remained for a time, and then came out, and entered the dry goods store of McLaren & Brown. The defendant saw them at the corner of Lake and Water streets, and followed them. He had in his pocket a revolver with five chambers of 38 caliber, and, while they were in the lawyer's office, he entered a pawn shop, and purchased another of the same make and caliber. He remained upon the street until they came out of the dry goods store, and then followed them down Water street, across the bridge, to Hudson street, and up Hudson street, nearly to their home. When in front of Nos. 112 and 114, he walked up behind them, and shot Mrs. Whitford, who fell upon the walk, near a tree. He then shot his wife, who fell over towards the fence. He then took her by the shoulder, raised her about two feet, and again shot her three or four times. Then he went to the horse block near by, sat down upon it, and shot himself in the left side three or four times. Both of the ladies shortly thereafter died, but the defendant recovered. The defense interposed was insanity.

Upon the trial, one Hopgood was sworn as a witness for the people, and after stating that he was acquainted with the defendant, and describing his actions, conduct, and statements, was allowed, under objection, to state that such actions, conduct, and appearance impressed him as rational. Other witnesses were allowed to answer a similar question, after testifying to the facts that they had observed with reference to the defendant. The rule is that persons not experts, after testifying to facts and incidents in relation to a person tending to show soundness or unsoundness of mind, may testify to the impression produced upon them thereby, and as to whether the acts and declarations testified to impressed them as rational or irrational; but they cannot be permitted to give an opinion as to the general soundness or unsoundness of mind of the person, or as to his mental capacity. Clapp v. Fullerton, 34 N. Y. 190; O'Brien v. People, 36 id. 276; Hewlett v. Wood, 55 id. 634; Holcomb v. Holcomb, 95 id. 316; People v. Packenham, 115 id. 200, 21 N. E. 1035; Paine v. Aldrich, 133 N. Y. 544, 547, 30 N. E. 725; People v. Taylor, 138 N. Y. 398, 409, 34 N. E. 275. Neither of the witnesses referred to were permitted to express any general opinion as to the mental condition of the defendant, but the testimony of each was brought squarely within the rule.

Dr. Putnam was sworn as an expert witness on behalf of the defendant, and testified that he made an examination of the defendant on the 14th of April before the trial, and questioned him with reference to his life with his wife, the beginning of his domestic troubles, their continuance, his trip west and return, his attempt to get into business, his letters that he wrote to different people, his attempt at reconciliation, etc. He was then asked to state his conclusion as to defendant's sanity or insanity at the time of the tragedy. The question was objected to by the district attorney, and the objection was sustained, the court remarking. "You have no right to base it upon the story told by the defendant himself, which is not here in evidence." We think the ruling was correct. The witness was an expert on the diseases of the mind, but he was not an expert on determinining the facts, where such facts had to be obtained from the statements of others. It was essential that the jury should be informed as to the facts upon

which the expert based his conclusions in order to determine whether they were well founded. If the facts were not disclosed, his conclusions could not be controverted. He might have been deceived by a false statement prepared for the occasion, and for the purpose of making him a valuable witness upon the trial. In Dickinson v. Barber, 9 Mass. 225, it was held that the opinion of a physician concerning the insanity of one of the parties could not be received in evidence, unless the facts were given upon which the opinion was founded. The court, in delivering its opinion, says: "Juries are to judge of facts, and, although the opinions of professional gentlemen on facts submitted to them have justly great weight attached to them, yet they are not to be received as evidence, unless predicated upon facts testified either by them or by others." In Heold v. Thing, 45 Me. 392, it was held that the opinion of a physician as to the insanity of the defendant could not be received in evidence where it was based upon declarations made to him by third persons, and, in the opinion, in the case of Dickinson v. Barber was cited as undoubtedly sound law. In Weatherbee v. Weatherbee, 38 Vt. 454, it was held that a physician should not be permitted to state in evidence his opinion when it is predicated upon a statement of facts made to him by another physician; that the opinion of an expert is admissible if based upon facts which the evidence tends to establish, but the jury should know upon what facts the opinion is founded, for its pertinence depends upon the jury's finding the facts to be true. In Abb. Tr. Ev. 117, it is said that "a medical witness must give the facts on which his opinion is founded in connection with his opinion. If those facts necessarily include information given him by the attendants of the patient, his opinion is incompetent, for those communications are hearsay." In People v. Lake, 12 N. Y. 358, 363, it is said; "Where a medical man, conversant with the disease of insanity, has had sufficient previous opportunity by his own observation to become acquainted with the personal habits, conduct, and appearance of the accused, upon authority, I think he may be asked the general question and give his opinion as to the sanity or insanity of the prisoner. In such cases it might be impossible for him to communicate to the jury every fact and circumstance, and all the details of conduct, habits, and

appearance, and the other particulars, upon which he had formed his conclusions. Of course, he may be questioned as to these, and as to his experience, skill, etc." In Insurance Co. v. Cotheal, 7 Wend. 72, 78, it is said that a physician may "express an opinion that the wound given or the poison administered produced the death of the deceased; but in such a case the physician must state the facts on which his opinion is founded." See, also, Cow. & H. Notes, 3 Phil. Ev. 273; Hathorn v. King, 8 Mass. 371. We have been speaking of information derived by the physician from statements made by others not under oath. A physician may acquire facts from his own observation. There is much in the actions, conduct, and appearance of a person that aids the physician in forming a conclusion as to his difficulty. The facts so acquired the physician may himself give in evidence, at least so far as they can be described. Again, the opinion called for was based upon statements made by the defendant long after the tragedy. In People v. Hawkins, 109 N. Y. 408, 410, 17 N. E. 371, Danforth J., in delivering the opinion of the court, says: "The prisoner's declaration in November as to his conduct in September was not competent as evidence of his actual condition at that time, nor could it be the basis of a scientific opinion as to whether he was sane or insane at that period. * .* * The witness was permitted to testify as an expert concerning the mental condition of the person in question, and his opinion would be of value only when founded on facts observed by himself, or proved by other witnesses under the obligation of an oath, or upon hypothetical statements." 1 Whart. Ev. § 441.

After the defendant separated from his first wife, it appears that he went to Odessa, and for a time resided with a Miss Myra Rockwell. The district attorney was permitted under the objection and exception of the defendant, to show that the general reputation of Miss Rockwell was that of a sporting woman. The court, in admitting the evidence, remarked that "the breaking up of the family relations means more to some men than to others. To a man who has been virtuous, and regarded as sacred that relation, it might have more influence on his mind than a man who had not that same regard for the sacredness of the relation." Again, the court remarked to the jury: "All the bearing this evi-

dence has is as showing what his regard was for the family relation, —whether he regarded it as sacred, so that upon the subsequent breaking of it up, what effect it might have upon his mind; that is the only relevancy of this evidence." At the conclusion of the trial, the court charged the jury as follows: "In the first place, I will call your attention to the evidence that I have permitted to be introduced here as to the relations of the defendant with Myra Rockwell. Now, generally, when a man is charged with a crime, upon the trial it is not proper to prove that he has committed other crimes. It is not proper to prove that he has done other improper acts, because he stands right upon this trial, upon the charge of this crime alone. The evidence of the relations of the defendant with Myra Rockwell was not admitted upon any such theory. It was limited when it was admitted. The theory upon which it was admitted was this: It is claimed by the defendant's counsel in this case that the rupture of the marriage relation by Joan Strait was what caused the unbalanced mind of the defendant, and caused him to become insane. It may be important, then, for you to know how the marriage relation stood in his mind,—that is, with what sanctity, with what sacred-ness, he regarded the relation; and it is upon that question alone that I have allowed evidence here as to his relations with Myra Rockwell while he had a family living at Havana. If it has no tendency to explain to you what the relation of his mind was, and whether that mind was caused to become unbalanced by the act of Joan Strait, then disregard it entirely. If it has a tendency, gentlemen, to give you any explanation upon that question, you can give it such weight as you think it is entitled to, and only such weight." We think that this evidence had no bearing upon the subject under investigation. It is true that the defense was insanity and that the defendant's counsel claimed that family trouble was the cause of his disordered mind; but the evidence objected to had no reference to his relations with his last wife. It related to a period nearly 10 years before, antedating by severa years his marriage to her. It appears that, for some reason, he had become estranged from his first wife, and had separated from her. It was during the period of his separation, and before he obtained his divorce, that he lived with Miss Rockwell. It may

be that at that time he did not regard his relations with his then wife as sacred or desirable. The inference would be that he did not, for he not only had separated and lived apart from her, but subsequently procured a divorce annulling his marriage to her. But it does not follow that, because of his dislike of his first wife, he also disliked his second wife. He may have regarded his relations with his second wife as sacred, and given her all the love and devotion of which he was capable, and the evidence had no tendency to prove or establish that he did not.

We think it cannot be said that the evidence was not harmful. We have specifically called attention to the remarks of the court, and to the charge made to the jury with reference thereto. The attention of the jury was pointedly called to it, and it was given greater prominence by the court than any other item of evidence produced upon the trial. The jurors were instructed that they might consider this evidence as bearing upon the relations existing between the defendant and his last wife, and as to how he regarded such relations. The effect of the instruction was that he did not have regard for his last wife, for the reason that he did not respect his first wife, and consequently the separation from him by his last wife did not tend to affect his mind or produce insanity. This we think was erroneous and harmful. The judgment and order should be reversed, a new trial granted. Judgment and order reversed.

All concur.