# FRANK EMMETT RICE v. STATE.

No. A-10378.   May 16, 1945.

(158 P. 2d 912.)

278

F. E. Riddle and Russell Linker, both of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., of Tulsa, for defendant in error.

BAREFOOT, P. J.   Defendant, Frank Rice, was charged in the district court of Tulsa county with the crime of robbery with firearms; was tried, convicted and given a sentence of life imprisonment in the State Penitentiary at McAlester; and has appealed.

Defendant was charged with having robbed Mr. and Mrs. W. B. Dossey on the night of April 26th, or the early morning of April 27, 1941. At the trial, a plea of insanity at the time of the alleged commission of the crime was entered.

The facts with reference to the commission of the crime with which defendant stood charged were as follows:

The defendant had been released from the State Penitentiary at McAlester about March 1, 1941. The evidence revealed that he had been "in and out of the penitentiary since 1932." At the time of the alleged crime, he was living with his mother, Mrs. Ruth Rice, in the city of Tulsa, and had secured work as a welder's helper at the Bethlehem Steel plant, in Tulsa.

On Saturday night, April 26, 1941, defendant did not go to work, but went to the Saratoga Bar, located at Peoria and Admiral streets, in the city of Tulsa, a place where beer was sold and dancing permitted in the rear. He was at the Saratoga Bar on four different occasions during the evening, and was arrested there about 1 o'clock, the morning of April 27, 1941. His mother testified that he had about $20 in money at the time; that he owned two suits of clothes, one of which he was wearing, and that he took the other suit from his closet and pawned it for $20.

Mrs. Hazel Hudgins worked at the Saratoga Bar, and had known the defendant for several years. She testified that he came in the Saratoga Bar early in the evening and gave her a sack containing a hamburger and some green onions. She had not eaten dinner, and was glad to accept this. He left, and about one hour later he returned and again brought her a sack containing a

hamburger and green onions. She thought this action strange, but accepted it. While she was talking with him this time, she noticed a bulge in his clothes, and saw that he had a gun. She asked him what he was doing with it, and he told her he was going to take it home. She asked him to let her keep it until he got ready to go home, and he immediately turned it over to her. A little later he came to her and asked for the gun, saying that soneone was going to take him home, and she gave the gun to him, and he left. In about an hour and 45 minutes he returned, and again brought her a hamburger and green onions. He talked with her a few minutes and left. He returned in about 30 minutes and asked her to have a drink with him, and they each drank a "coke." While drinking the "coke" she again noticed the bulge in his clothing, pulled his coat back, and saw the gun. A short time thereafter the officers arrived and arrested him.

Mr. and Mrs. W. B. Dossey testified that they had been in Bill Cleveland's grill, located at Fifteenth and Peoria streets, in Tulsa, and were leaving about 11 o'clock. Mr. Dossey assisted his wife in entering the car, and when he turned to go around the car to get in, he was confronted by the defendant, with a gun in his hand. He tried to take the gun, knocked the defendant up against the car, and went around to the driver's side. As he did, the defendant held his gun on Mrs. Dossey, and told Mr. Dossey that if he did not get in the car, he would shoot Mrs. Dossey. Defendant then told Mrs. Dossey to open the rear door of the car, and he got in and told Mr. Dossey to "start driving." Mr. and Mrs. Dossey both testified that the defendant directed where they should drive, and tried to impress upon them that he was a bad man. He told Mr. Dossey he should never

interfere with a man with a gun who was holding him up, and that his gun was not loaded at the time or it would have been too bad. Shortly thereafter, he fired his gun between them, through the windshield. Several times during the ride defendant mentioned that he needed "potatoes."

Defendant directed Mr. Dossey where to drive, and they drove over the river bridge, and on out to Red Fork, adjacent to Tulsa. There he looked for a bank, and had them drive around, and finally told them to stop. Mr. Dossey told him, "If you want our money, let's get this thing over with, and you can have what we have." The defendant then directed Mrs. Dossey to take the billfold from her husband's pocket and hand it to him, warning Mr. Dossey to keep his hands on the steering wheel. Defendant took $22 and all papers from the billfold, and handed the billfold and $11 back to Mrs. Dossey, saying, "I will take half and you can have half." He then had them drive back to Tulsa, but on the way stopped and had Mrs. Dossey look in the back seat for the empty shell from his gun. He had them drive him back to the main business district of Tulsa, where the electric lights were burning brightly, and got out of the car not far from the police station.

Mr. and Mrs. Dossey drove directly to the police station and reported the incident, and the police officers found defendant at the Saratoga Bar "around 1 o'clock." They took the gun from him, and found the discharged shell in his pocket. He was in the back room when the officers arrived and asked for him. Mrs. Hudgins heard the officers, and told the defendant, "They are looking for you—what for?" He answered her, "I don't know, but I will tell them I am here." Defendant was taken

to the city jail, and upon being questioned by the officers, freely admitted what he had done.

The mother of the defendant, Mrs. Ruth Rice, testified to the defendant having been confined in the State Penitentiary at McAlester the last time for a period of four years. That after he had been there about two years she was called to McAlester and informed that defendant had suffered a nervous break-down. She found him in the prison hospital, where he remained three weeks, and was strapped to the bed for eight days. Her brother went with her, and defendant did not recognize either of them. He was later taken back to his cell, and remained in the penitentiary for 18 months thereafter. When she went to visit him, he would just sit at the table, look into space, and jump up and say, "I am going, Mother;" and did not appear to want her there.

She also testified that the father of defendant had wandered off and left her to support the children. That his mind became weak, and he was just like a little child. That he would not work, and knew nothing about the children, or where they were, and finally just wandered off, and never did come back. It was also revealed that defendant had a grandmother who had been committed to the insane asylum.

Mrs. Rice testified to the nervous condition of the defendant after he returned from the penitentiary at McAlester, and that he would go to the kitchen and just sit there and say nothing; and that on one occasion he accused her of trying to poison him, and refused to drink his coffee. This was only a few days before the robbery was committed by the defendant. The defendant committed this crime about 56 days after his return from the penitentiary the last time.

The importance of the issues involved in this case have caused us to give it very careful consideration. It has been twice orally argued by request of the court, and additional briefs have been filed both by the state and the defendant. All of the questions raised may be considered together.

As to the question of insanity, we desire to quote certain statutes of this state, which were in effect prior to 1935. Sections 3211, 3212, and 3213, O. S. 1931, provide:

"3211. An act done by a person in a state of insanity cannot be punished as a public offense, nor can a person be tried, adjudged to punishment, or punished for a public offense, while he is insane."

"3212. When an indictment or information is called for trial, or upon conviction the defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the fact." (Tit. 22 O. S. 1941 § 1162.)

"3213. The trial of the cause or the pronouncing the judgment, as the case may be, must be suspended until the question of insanity is determined by the verdict of the jury." (Tit. 22, O. S. 1941 § 1163.)

These statutes have been in force and effect in this state for many years. In 1935 the Legislature amended section 3211 so that it now reads as follows: Tit. 22 O. S. 1941, § 1161:

"An act done by a person in a state of insanity cannot be punished as a public offense, nor can a person be tried, adjudged to punishment, or punished for a public offense, while he or she, as the case may be, is insane; but where in any criminal action by indictment or information the defense of insanity is interposed either singly

or in conjunction with some other defense the jury must state in the verdict, if it is one of acquittal, whether or not the defendant is acquitted on the ground of insanity and where the defendant is acquitted on the ground that he or she, as the case may be, was insane at the time of the commission of the crime charged, such person shall if the jury returning such verdict state therein that they deem the discharge of said·person dangerous to the public peace, or safety, be by the trial court committed to one of the State's hospitals for insane, there to be held and kept as a patient until legally discharged therefrom. * * *''

The amendment of 1935 did not affect or change sections 3212 or 3213 of the 1931 statute, and they are carried forward in the 1941 statute as Tit. 22, §§ 1162, 1163, in their original form. The only change made by the amendment of 1935 was to the effect that if the jury returned a verdict of not guilty where the defense of insanity was interposed, they must state in their verdict whether they deemed the discharge of said person dangerous to the public peace or safety. And if so, he should be by the trial court committed to one of the state hospitals for the insane, to be there kept until legally discharged.

The Criminal Court of Appeals has had occasion many times to construe the above statutes prior to the amendment of 1935. Marshall v. Territory, 2 Okla. Cr. 136, 101 P. 139; Maas v. Territory, 10 Okla. 714, 63 P. 960, 53 L.R.A. 814; Signs v. State, 35 Okla. Cr. 340, 250 P. 938; Weiland v. State, 58 Okla. Cr. 108, 50 P. 2d 741; Alder v. State, 53 Okla. Cr. 374, 12 P. 2d 545; Johnson v. State, 73 Okla. Cr. 370, 121 P. 2d 625; Ex parte Gilbert, 71 Okla. Cr. 268, 111 P. 2d 205.

The amendment to the statute has never been considered by this court.

We do not desire to unduly lengthen this opinion by

quoting from the opinions above cited. In the late cases of Johnson v. State, supra, and Ex parte Gilbert, supra, we have cited and fully discussed the earlier opinions. These opinions set out in full the procedure to be followed when the question of present insanity is called to the attention of the court; and the manner in which it may be called to the court's attention.

In the case of Weiland v. State, supra, distinction is made in the manner of procedure where the question of insanity of a defendant at the time of the trial is presented; and where the question of insanity at the time of the commission of the offense is interposed.

In the first instance, if the trial has not started, the court impanels a jury for the sole purpose of trying the issue of defendant's present sanity. The same procedure is followed if at any time during the trial the question arises as to the present insanity of the defendant. In the second instance, the question of defendant's insanity at the time of the commission of the offense is presented to the jury under proper instructions, with the question of his guilt or innocence of the offense with which he stands charged.

In the instant case, the defendant having entered a plea of insanity at the time of the commission of the offense, both the issue of his guilt and the question of his insanity at the time of the alleged commission of the crime were presented to the jury in one trial; and while defendant in his brief suggests the unconstitutionality of 22 O. S. 1941 § 1162, as amended in 1935, and as applied to the facts here presented, we do not consider it necessary to pass upon the constitutionality of this statute in deciding this case.

Defendant contends, among other grounds, that by

reason of the court permitting to be introduced before the jury certain evidence in rebuttal, he was prevented from having a fair and impartial trial, to which he was entitled under the law. This was the testimony of Deputy Sheriff E. E. Benson, and Sheriff A. Garland Marrs that in their opinion the discharge of the defendant would be dangerous to the public peace or safety.

This procedure was evidently followed because of the phrase in the statute above quoted, which provides:

"* * * The jury must state in the verdict, if it is one of acquittal, whether or not the defendant is acquitted on the ground of insanity and where the defendant is acquitted on the ground that he or she, as the case may be, was insane at the time of the commission of the crime charged, such person shall if the jury returning such verdict state therein that they deem the discharge of the said person dangerous to the public peace, or safety, be by the court committed to one of the state's hospitals for insane * * *."

Attorneys for both the state and the defendant have stated that they have been unable to find a similar provision in the statutes of any other state, and our search has disclosed none.

It is the contention of the defendant that the action of the trial court violated certain fundamental rights of the accused, and denied him a fair and impartial trial; that it violated the rule against the giving of opinion evidence and caused other alleged wrongful acts to be brought to the attention of the jury which were improper for their consideration.

We here quote the evidence of the deputy sheriff, E. E. Benson, and the sheriff, A. Garland Marrs, on rebuttal, in which they testified that in their opinion the discharge

of defendant would be dangerous to the public peace or safety of the citizens.

E. E. Benson, after testifying that he had been a peace officer in Tulsa county since 1922, testified:

"Q. Do you know the defendant in this case, Frank Rice? A. Yes, sir, I do. Q. How long have you known him, Mr. Benson? A. I would say I have known Frank about 12 years, or 13. Q. Mr. Benson, I will ask you as a peace officer if in your opinion you would deem the discharge of Frank Rice dangerous to the public peace or safety? Mr. Riddle: If the court please, the defendant objects to that question as not in issue here, and not being tried on that issue, and besides, he was released from the hospital at Vinita a few months ago as having been cured, and if a man is dangerous to the community the law provides— Mr. Simms: We object to the argument. Mr. Riddle: I am not arguing. I am making my objection. The law provides a method whereby a community can be protected by placing him under a peace bond. The Court: Overruled. Mr. Riddle: Give us an exception. The Court: The court bases it on section 1161, Title 22, Oklahoma Statutes Annotated. Q. You may answer that question. A. Will you repeat that question. Q. Read it to him, Mr. Harry. (Question read by the Reporter.) A. I would deem it wasn't safe. Q. Sir? A. It would not be safe. Q. It would not be safe? A. No."

And the testimony of A. Garland Marrs, sheriff, on rebuttal was as follows:

"Q. You may state your name to the court and jury. A. A. Garland Marrs. Q. You are the sheriff of Tulsa county, and have been for some time? A. Yes, sir. Q. Prior to your becoming sheriff, were you chief of police in the city of Tulsa for a period of time? A. Yes, sir. Q. Mr. Marrs, do you know the defendant, Frank Rice? A. Yes. Q. About how long have you known him? A. About seven years. Q. From your knowledge of Frank Rice, would you deem the discharge of Frank Rice dan-

gerous to the public peace and safety? A. I would. Mr. Riddle: Wait a minute. We object to that question, if the court please, as not an issue in this case, and could not properly be made an issue until after the jury returns a verdict under the statute contended for, and for the further reason that he is not being tried on any issue of being a dangerous person, and is only tried for one specific crime, and for that reason the question is improper, incompetent, and introduced to prejudice the court and jury against the defendant. The Court: Overruled. Mr. Riddle: Exception. Q. Now what was your answer, please? A. I would."

A careful study of this record can but convince one that the punishment assessed against this defendant— that of life imprisonment in the State Penitentiary—was by reason of the testimony above quoted. We are firmly convinced that no such punishment would have been assessed if this evidence on rebuttal had not been presented. It will be noted that these officers were permitted to testify on direct examination that in their opinion the discharge of the defendant would be dangerous to the public peace or safety. This testimony was given by them without reference to the question of the insanity of the defendant. It was based, if upon anything, on the criminal record of the defendant. Under the statute, this question would arise where the defendant was found not guilty by reason of insanity, and not because of any previous criminal record. We know of no rule of evidence which would permit an officer to give his opinion with reference to a question such as this.

The verdict of the jury, in our opinion, should be based upon the facts in the case on trial and the testimony of medical experts who have examined the defendant, and not based upon other crimes allegedly committed

by him, or upon opinion evidence of lay witnesses, based upon other crimes allegedly committed by the defendant.

We have held that where insanity is interposed as a defense, a nonexpert witness, after testifying to the acts, conduct and appearance of the defendant, may state whether such acts, conduct and appearance impressed him as being rational or irrational. That is, whether he was sane or insane. But it has never been held that an officer may give his opinion simply because of the previous criminal record of the defendant. Queenan v. Territory, 11 Okla. 261, 71 P. 218, 61 L.R.A. 324; affirmed 190 U.S. 548, 23 S. Ct. 762, 47 L. Ed. 1175; Hile v. State, 54 Okla. Cr. 137, 15 P. 2d 1049; Tapedo v. State, 34 Okla. Cr. 165, 245 P. 897; Bell v. State, 14 Okla. Cr. 167, 168 P. 827. See also People v. Strait, 148 N. Y. 566, 42 N. E. 1045.

In the early case of Colbert v. State, 4 Okla. Cr. 500, 113 P. 558, 559, this court said:

"It is a well-known general rule that witnesses are not to give their individual opinions, or state their conclusions, when the jury are equally competent as to such matter to form the opinion or deduce the conclusion sought from the facts. The question asked went to the merits of the whole case. There is no appreciable difference between the opinion asked for, and a request for the witness' opinion as to whether the alibi was proved. The court properly sustained the objection."

Here the witnesses on rebuttal were not even asked on direct examination to give the facts, but the direct question to the officer was: "I will ask you as a peace officer if in your opinion you would deem the discharge of Frank Rice dangerous to the public peace or safety." The answer was: "It would not be safe." The verdict of life imprisonment rendered in this case reveals the terrific effect of this testimony on the minds of the jury.

It could not have been otherwise than prejudicial to the rights of the defendant, and in our opinion was inadmissible and denied to him a fair and impartial trial as guaranteed by the laws of this state.

At the time of the adoption of the amendment in 1935, the Legislature was endeavoring to curb a very prevalent practice of pleading insanity at the time of the commission of the crime as a defense. The legislators evidently thought that the practice would be stopped if the defendant faced the possibility of incarceration in an institution by reason of his insanity if the jury so determined. The amendment was not copied from the laws of any other state and for this reason we do not have precedent to guide us in laying down rules of procedure under this statute. Being a case of first impression, it appears to us that it would inject too many collateral issues into the case to allow witnesses to express their opinion as to whether the discharge of defendant would be dangerous to the public. This invades the province of the jury and their verdict should be based on the facts in connection with the crime charged in the information. To hold any other way would sustain an unconstitutional application of the statute.

Proof of the commission of other crimes, unrelated and unconnected with the crime for which the defendant is on trial, have always been held to be inadmissible. Herren v. State, 75 Okla. Cr. 251, 130 P. 2d 325; Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L.R.A. 1917D, 383; State v. Rule, 11 Okla. Cr. 237, 155 P. 807; Boyer v. State, 68 Okla. Cr. 220, 97 P. 2d 779; Perdue v. State, 40 Okla. Cr. 9, 266 P. 514; Ricker v. State, 39 Okla. Cr. 58, 263 P. 160; Stanfield v. State, 30 Okla. Cr. 82, 235 P. 256. Unless the crime was such as to show a plan or

scheme, or was so connected with the crime as to be a part of the res gestae. Boyer v. State, supra; Chappell v. State, 74 Okla. Cr. 213, 124 P. 2d 742; Herren v. State, supra.

It is true that on cross-examination of these witnesses, there was an attempt on their part to justify their opinion that the discharge of the defendant would be dangerous to the peace or safety of the public by reason of certain acts done by him. But by the cross-examination it was also shown that there was very little justification, if any, for this belief, unless it was based upon the fact that the defendant was insane, not only at the time of the commission of the offense, but was insane at the time of the trial, and at the time they were testifying. To lay down the rule that an officer may be permitted to give his opinion that a defendant's discharge would be dangerous to the public peace or safety and to relate other crimes allegedly committed by defendant as a basis for their opinion would, in our opinion, be setting a precedent that would in many instances deny the defendant that fair and impartial trial to which he is entitled under the law.

As we view it, the facts in the instant case clearly justify the conclusion which we have reached. The minimum punishment prescribed by the statute for this offense was five years in the penitentiary. The maximum punishment was death, or life imprisonment. From a careful reading of the record as to the facts, we can but come to the conclusion that if there had been no plea of insanity in this case, and the defendant had rested when the state closed, that only a very moderate sentence would have been assessed. Certainly not imprisonment for life.

Two reputable physicians testified for the defense in

this case, and each positively testified that in his opinion the defendant was insane at the time of the commission of the offense. These two physicians, Dr. Summers and Dr. Perry, had both examined the defendant very soon after the commission of the crime, and at the time he was sent to the insane asylum at Vinita. He remained in the asylum at Vinita for a period of nine months, when he was returned by the authorities to the custody of the sheriff of Tulsa county, and then tried upon the charge here preferred. Both of these physicians testified that they made a thorough investigation at the time, and that they consulted with the county attorney and the sheriff of Tulsa county, and were familiar with the criminal record of the defendant at the time they came to the conclusion that he was insane and should be sent to the asylum at Vinita for treatment. The trial court properly denied the admission in evidence of the report made by the sanity board at the time, for the reason that it was not an adjudication that the person was insane. Ex parte Gilbert, supra.

In many instances parties are sent to the asylum for treatment who are not really insane in a legal sense, but who, in the opinion of the board of examiners, may be improved by the treatment to be received. This is the reason for the rule prohibiting the admission of the order in evidence. However, this does not prohibit the doctors who made the examination from testifying at the trial of defendant that from their examination he was insane at the time of the commission of the offense. The testimony of both Dr. Summers and Dr. Perry that the defendant was insane at the time of the commission of the offense was very positive, and they gave substantial reasons for their opinions.

The acts of the defendant just prior to the commission of this crime, and during the time of the commission of the crime as testified to by the prosecuting witnesses, heretofore related; his conduct after the commission of the crime, and the testimony as to the mental condition of his father, and the fact that other relatives had been insane, all taken together, raise a grave doubt as to the defendant's sanity at the time of the commission of the offense.

If the jury had found the defendant not guilty by reason of insanity, then in compliance with the Oklahoma statute, 22 O. S. 1941 § 1161, heretofore quoted, they could have stated in their verdict that they deemed the discharge of defendant dangerous to the public peace or safety, and he would not have been released, but committed by the court to one of the state hospitals for the insane, and held there until legally discharged. This action would not have permitted his release, but would have permitted his confinement in the proper place. However, in accordance with our practice, as above outlined, this was a question for determination by the jury.

We are firmly convinced that when the state was permitted to introduce on rebuttal the testimony of Deputy Sheriff Benson and Sheriff Marrs that in their opinion the discharge of defendant would be dangerous to the public peace or safety of the citizens of this state, and to relate other crimes allegedly committed by defendant as the basis for their opinions, the jury evidently did not consider the question of defendant's guilt or innocence, raised by the issues in this case, but at once came to the conclusion that if defendant was dangerous to the public peace or safety, they would assess against him a punishment of life imprisonment. This, in our

opinion, was not justified, and by reason thereof defendant did not have a fair and impartial trial, as contemplated by the Constitution and laws of this state.

The writer of this opinion is inclined to believe that it would be wise for the Legislature of this state to consider the enacting of a law requiring that the question of insanity, whether claimed at the time of the trial or at the time of the commission of the offense, should be submitted to a jury separate and apart, and before the trial of defendant upon the merits of the case with which he stands charged. This, however, is a question for the Legislature, and not for the courts.

The judgment of the district court of Tulsa county is reversed and the case remanded, and the warden of the penitentiary at McAlester is directed to immediately release the defendant to the custody of the sheriff of Tulsa county, to be by him held subject to the order of the district court of Tulsa county.

JONES, J., concurs. DOYLE, J., not participating.