**Ralph L. BROWN, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. F–85–424.

Court of Criminal Appeals of Oklahoma.

March 23, 1988.

James E. Gotcher & Associates, McAlester, for appellant.

Michael C. Turpen, Atty. Gen., Terry J. Jenks, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Judge:

The appellant, Ralph L. Brown, was tried by jury in Pittsburg County District Court, Case No. CRF–84–278, and convicted of First Degree Malice Aforethought Murder (21 O.S.Supp.1982, § 701.7), before the Honorable Steven W. Taylor, Associate District Judge. The jury found that the murder was especially heinous, atrocious or cruel, and recommended a sentence of death. Judgment and sentence was imposed in accordance with the jury's verdict. We modify the death sentence to life imprisonment and otherwise affirm.

Oklahoma Highway Patrol Trooper Oscar Garvin testified that around 3:00 a.m. on September 4, 1984, the appellant walked into the Pittsburg County Jail, told Garvin that he just killed his wife, and laid a .25 semi-automatic pistol on the counter. Garvin's testimony was corroborated by Al Durant, who was a jailer and dispatcher present at the jail. After pleading with Trooper Garvin to help his wife, the appellant led Garvin to where his wife was located. Upon arriving at the scene, Trooper Garvin found a McAlester police officer with the victim, who was dead. Trooper Garvin then placed the appellant under arrest, read him his *Miranda* rights, and placed him in his patrol car. Garvin further testified that on the way to the station, the appellant voluntarily blurted out that "she'll never cheat on me again." Garvin testified that he did not ask the appellant any questions after he read him his *Miranda* warnings. Dr. Murlyn Bellamy, a forensic pathologist, conducted an autopsy of Karen Denise Brown, the victim, and determined that the cause of death was multiple gunshot wounds. He found seven entry wounds, two of which went through her heart and aorta and could have caused death. Dr. Bellamy found powder burns around a gunshot wound to the deceased's left arm, which indicated that the gun was close to the victim when fired. On cross-examination, Dr. Bellamy testified that the bullets entered from the victim's left upper torso, and that he could not determine whether she was laying down or sitting up when she was shot. Dr. Bellamy further testified that, because of the gunshot wounds to the heart and aorta, the victim could have survived "a few minutes at the most."

The seven bullets removed from the victim by Dr. Bellamy were ultimately turned over to James Looney, an OSBI forensic ballistics expert, who testified that five of the seven bullets were positively fired from the .25 caliber semi-automatic pistol. Looney further identified four shell casings, which were found in the victim's car by Detective George Scott, as being fired from the same weapon.

Monte Phillips testified that while he was driving, he observed a car that had run off the road into a tree. He found the deceased lying across the front seat with her head "flush to the floorboard on the passenger side and her feet were still on the driver's side." Phillips checked the deceased for a pulse, but found none. Detective George Scott investigated the scene where the victim was found. Detective Scott testified that according to his observations, the victim's car ran off the road in

front of a culvert, bounced over the culvert into a yard, and came to a stop one-hundred-fifty eight feet away against a tree. Detective Scott testified that in his opinion, the appellant fired several shots which caused the victim to run off the road, and that the appellant then stuck his hand inside the window of the car and shot the victim four times after the car was resting against the tree. Scott based his opinion on the fact that he found four shell casings inside the victim's car, something caused the victim to run off the road, and the victim was shot seven times.

Jim Fuller testified on behalf of the appellant concerning marital problems which existed between appellant and his wife, concerning her spending of money and use of drugs. He further testified that he never saw the appellant act violent or abusive. Pat Smith testified that the appellant had a reputation as a truthful, law abiding citizen. The appellant testified that he and his wife had physical altercations over her demands for money, which he claimed she used to buy cocaine. He stated that on the morning of September 4, 1984, before he could confront his wife's mother about his wife's drug problem, his wife confronted him during an argument and pointed the .25 caliber pistol at him. The appellant talked her into giving the gun to him. Subsequently, the appellant began experiencing chest pains, and stated that the next thing he remembered was getting up from the ground with the gun in his hand and seeing his wife slumped over the steering wheel, moaning. On cross-examination, in response to the prosecutor's question to the effect that either Mrs. Brown had to shoot herself seven times or the appellant had to shoot her seven times, the appellant responded that "it appears that way." Appellant testified that he did not remember any shooting or making any statements that he killed his wife.

Dr. Bill Hutchins testified that he ran some medical tests on the appellant which indicated that the appellant had suffered a heart attack sometime prior to October, 1984. Dr. Hutchins stated that such an attack could result in loss of memory and irresponsible actions. The State then presented several witnesses in rebuttal. Max McElroy testified that on either August 24 or 25, 1984, he saw the appellant punching the deceased in the mouth. He saw the appellant get a gun out of his car, and heard him say, "I think she's f——ing around on me." Carl Nichols, the brother-in-law of the deceased, testified that he observed the deceased with a very bad black eye in April of 1984, and that the appellant told him his wife got the black eye because "she was mouthing him, so he knocked hell out of the ... damned bitch." The decedent's mother testified that the deceased had money when she died, that she was opposed to drug use, and that she was a happy, cheerful person. The decedent's two children testified that the appellant had pulled a gun on the deceased during their marriage. The appellant denied the foregoing testimony.

## I.

## ISSUES RELATING TO GUILT–INNOCENCE

### A.

■ In his first assignment of error, the appellant contends that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant asserts that the prosecutor failed to disclose information concerning a test conducted on the appellant's hands on the morning of the homicide to determine whether he had recently fired a weapon. Defense counsel specifically requested disclosure of the results of all scientific tests. (O.R. 39–40) During the presentation of his defense, the appellant testified on direct examination that Officer Scott conducted a paraffin test on his hands. (Tr. III, at 90–91) In spite of this revelation, no objection was made at trial that the report on the paraffin test had not been disclosed. Defense counsel Foor stated that the appellant told him about the paraffin test during trial while sitting at counsel table. Clearly, defense counsel was made aware of the test during trial so that a request for the test results could have been made, if in fact the results

were withheld. At the hearing on the motion for new trial, Detective George Scott testified that such a test was conducted on the appellant and submitted to the FBI, and that the report on the test was inconclusive. Jennye Hickman testified that she personally handed the FBI report to defense counsel prior to trial. Although both trial attorneys claimed that, to the best of their recollection, they had not been given a copy of the test results, Attorney Foor argued to the jury during closing argument that the test results on the paraffin test were negative:

> I noticed that Mr. Brown testified that while he was down at the jail hurting, that Mr. Scott took a parafin test to see whether he fired the weapon. Where's the test? Of course, to be perfectly honest with you, .25 caliber automatics usually don't throw enough powder to make the parafin test work. But Scott didn't volunteer that he took one and it was negative. (Tr. IV, at 63)

*Brady* requires disclosure of evidence that is both favorable to the accused and material as to guilt or punishment. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). A constitutional error requiring a new trial exists only "if the omitted evidence creates a reasonable doubt that did not otherwise exist ... [and] the omission must be evaluated in the context of the entire record." *Id.* at 112, 96 S.Ct. at 2402.

The record is conflicting on whether the FBI report on the results of the paraffin test was turned over to the appellant's trial attorneys. This Court is hard pressed to find error, in light of Ms. Hickman's testimony that the FBI report was given to defense counsel, and the fact that defense counsel was made aware of the existence of the paraffin test during trial, at a time when such test results could have been requested if they had not previously been disclosed. Considering the fact that the existence of the paraffin test was revealed during trial, we are not persuaded that the disclosure of the evidence came so late as to prevent the defendant from receiving a fair trial. *See United States v. George*, 778 F.2d 556, 561 (10th Cir.1985). In any event, having reviewed the record evidence presented against the appellant, in view of the fact that appellant's counsel became aware of the test during trial, we cannot say that the omitted evidence created a reasonable doubt that did not otherwise exist. *Agurs*, 427 U.S. at 112, 96 S.Ct. 2402. *See also United States v. Bagley*, 473 U.S. 667, 684–85, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985). This assignment of error is without merit.

### B.

■ Appellant argues in his second assignment of error that the trial court erred in admitting evidence of other crimes, wrongs or acts. *See* 12 O.S.1981, § 2404(B). He complains about questions directed to him on cross-examination concerning whether he had deserted from the military, and whether he had harmed or threatened to harm anybody. He also complains about rebuttal testimony by Max McElroy and Carl Nichols. In the absence of a timely specific objection, however, these contentions have not been properly preserved for appellate review. *See* 12 O.S.1981, § 2104(A)(1); *Ross v. State*, 717 P.2d 117, 121 (Okla.Crim.App.1986). Appellant further complains about the admission of testimony by the decedent's two children concerning the appellant's pointing a gun at the deceased during an argument. Only one of these two instances was preserved for review by a timely specific objection. We find that such evidence was probative of appellant's motive and/or intent. *See* 12 O.S.1981, § 2404(B). Accordingly, we find no error.

### C.

In his fourth assignment of error, appellant complains that he was deprived of a fair and impartial jury by the exclusion of prospective jurors who were opposed to

capital punishment. This Court has adopted the United States Supreme Court's recent decision in *Lockhart v. McCree,* 476 U.S. 162, 183–84, 106 S.Ct. 1758, 1770, 90 L.Ed.2d 137 (1986), which rejected such a position. *See VanWoundenberg v. State,* 720 P.2d 328, 331–32 (Okla.Crim.App.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). Accordingly, this assignment of error is without merit.

### D.

■ In his fifth assignment of error, appellant asserts that he was denied access to an independent psychiatrist in violation of *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). We disagree. On September 14, 1984, upon application by defense counsel, the trial court ordered the appellant to be admitted to Eastern State Hospital in Vinita for a competency examination. Appellant was determined to be competent to stand trial. Subsequently, the *Ake* decision was decided on February 26, 1985, and that same day defense counsel filed a motion for funds for a psychiatric examination. On March 4, 1985, a hearing was held and defense counsel was directed by the trial judge to prepare a proper order to request a psychiatrist at Eastern State Hospital to determine the appellant's sanity at the time of the offense, in light of a previous medical report that the appellant had suffered a heart attack near the time of the offense. (March 4, 1985 Motion Tr., at 3–4) The order was issued by the trial judge the same day. (O.R. 33–34) The record of a pretrial hearing held on March 25, 1985, shows that the appellant was provided access to two physicians at Eastern State Hospital, who were made available as defense experts, to assist in consultation, evaluation and preparation of a defense: (1) Dr. Edward K. Norfleet, a staff psychiatrist, and (2) Dr. B.F. Hutchins, a medical doctor. Defense Exhibit No. 2, admitted during the hearing, shows that the cardiogram done on appellant was interpreted by Dr. Conrad, a cardiologist of Tulsa. Near the end of the hearing, defense counsel stated that "I believe I can cure most of this with a hypothetical by telephone or ... in writing. I believe it

will answer our whole problem ... I will contact Doctor Norfleet.... [and] ... if he does not comply with the hypothetical, then we'll come back over here again...." (Motion Tr., at 32–33) No other objections were made prior to trial indicating that Dr. Norfleet had not complied with defense counsel's requests.

Dr. Hutchins testified on behalf of the appellant at trial that medical tests showed that the appellant had suffered a "recent" heart attack. The appellant's defense theory was that he was incapacitated by a heart attack at the time the homicide occurred. At trial, appellant did not present any medical testimony that he was insane at the time of the offense, nor did the State introduce psychiatric evidence against him. Even if we were to agree, which we do not, that appellant made the required *ex parte* preliminary showing that his sanity at the time of the offense was to be a significant factor at trial, the record shows that the appellant had access to competent medical personnel to assist in the preparation, evaluation and presentation of his defense. On this record, we conclude that appellant received the "basic tools" of an adequate defense within the meaning of *Ake. See Standridge v. State,* 701 P.2d 761, 764 (Okla.Crim.App.1985). This assignment is without merit.

## II.

### ISSUES RELATING TO PUNISHMENT

#### A.

■ Recently, in *Stouffer v. State,* 742 P.2d 562, 563 (Okla.Crim.App.1987) (Opinion on Rehearing), this Court agreed with the Tenth Circuit's conclusion in *Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987), that this Court's past construction of the "especially heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague. In *Stouffer,* we held that this aggravating circumstance is applicable only where there is evidence that the death of the murder victim was preceded by torture or serious physical abuse. *Stouffer,* 742 P.2d at 563. This Court held

that "in the absence of evidence of physical or mental suffering, the aggravating circumstance that it was heinous, atrocious, or cruel was not supportable." *Id.* at 564 (citing *Odum v. State,* 651 P.2d 703 (Okla. Crim.App.1982)). We find that the same is true here. Accordingly, we turn to the issue of the sufficiency of the evidence to support this sole aggravating circumstance.

Dr. Murlyn Bellamy, a forensic pathologist, testified that the victim died from multiple gunshot wounds. Dr. Bellamy stated that he found seven entry wounds, with one of the shots going through the heart and another going through the aorta. Either of these two shots, according to Bellamy, could have been fatal, and a person with such wounds would have survived "a few minutes at the most." Although Detective Scott was permitted to relate his theory that the appellant shot the victim several times before her car ran off the road, and that he shot her four more times after her car ran off the road into a tree, the evidence presented at trial simply did not establish when the two fatal shots were inflicted. After carefully reviewing the record, we cannot say the evidence presented by the State was sufficient to establish the requisite torture or serious physical abuse necessary to sustain the heinous, atrocious or cruel aggravating circumstance under 21 O.S.1981, § 701.12(4), beyond a reasonable doubt as required by 21 O.S.1981, § 701.11. *See Stouffer, supra; Odum v. State,* 651 P.2d 703, 707 (Okla. Crim.App.1982). This was the sole aggravating circumstance contained in the Bill of Particulars required by 21 O.S.1981, § 701.10, and found to exist by the jury under 21 O.S.1981, § 701.11, and therefore, the sentence of death must be set aside and modified to life imprisonment.

### B.

■ Finally, we wish to express our extreme disapproval of the prosecutor's argument during the second stage, in which he asked the jury "to call Kay Brown back from the grave, put her on the stand under oath" and that, if asked, she would say " 'yes, I think it was heinous, yes, I think it was cruel, yes, I think it was atrocious.' " The prosecutor continued: "I dare say that Kay would say 'it was not a pleasant experience and I was going through torture during that few minutes as I was laying there dying....' " Defense counsel's objections to the argument were overruled. As this Court stated in *Tobler v. State,* 688 P.2d 350, 354 (Okla.Crim.App.1984), it is improper for the prosecution to make pleas to the jury for sympathy for the victim. Further, such comments are contrary to the *ABA Standards for Criminal Justice,* § 3–5.8(c) (1980), which expressly forbid arguments "calculated to inflame the passions or prejudices of the jury." The prosecutor improperly went outside the record by speculating on what was going through the victim's mind at the time of the shooting. *See Thompson v. State,* 462 P.2d 299, 304–05 (Okla.Crim.App.1969). Additionally, the prosecutor improperly gave his personal opinion that this case called for the death penalty. *See Young v. State,* 695 P.2d 868, 869 (Okla.Crim.App.1985) ("[T]he prosecutor is allowed to draw logical inferences and state his conclusions based upon the evidence, but it is improper for him to state his personal opinion."). Trial judges have an affirmative obligation "to ensure that final argument to the jury is kept within proper, accepted bounds." *ABA Standards, supra,* § 3–5.8(e). We find that the improper comments during the second stage further supports our decision to modify the appellant's sentence to life imprisonment, based on our statutory duty under 21 O.S.Supp.1986, § 701.13(C)(1), to determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

For all of the foregoing reasons, the sentence of death is vacated and hereby MODIFIED to life imprisonment and, as modified, the judgment and sentence is otherwise AFFIRMED.

BRETT, P.J., concurs.

BUSSEY, J., specially concurs.

**914**

BUSSEY, Judge, specially concurring.

I agree that the conviction must stand and that the sentence should be modified to life.

As I read the record, a jury could have found that the victim's death was preceded by serious physical abuse. Testimony reconstructing the murder scene showed that the victim was shot, lost control of her vehicle, ran into a tree, attempted to escape her assailant, and was shot four more times inside the car. At least one time, she was shielding herself from gunfire. Any conflicting testimony presented a question of fact for the jury and their determination should not be disturbed. I cannot agree that being shot, chased down, and shot again does not constitute serious physical abuse preceding death. The evidence adequately supports the aggravating circumstance of heinous, atrocious, or cruel.

However, I must concur in results, since the prosecutor did engage in improper closing argument during the second stage by injecting his personal opinion as to the propriety of the death sentence. Specifically, he stated:

"Ladies and gentlemen of the Jury, it's not an easy decision that Mr. Whittington and I must ask when we seek the death penalty. We have to search our conscience before we can ever ask you. This case, in my opinion, calls for the death penalty, because of the very nature of the way it was. Ralph Brown did not shoot her seven times. He pumped seven bullets into her body intentionally. For that, I think he should receive the ultimate punishment."

This statement, coupled with other remarks noted in the majority opinion, created sufficient prejudice that the sentence of death must be set aside.

At the time of the conviction in this case, a remand for resentencing was not possible under the law. Therefore, the death penalty must be set aside and the sentence modified to life imprisonment.