Howard C. **MARQUEZ**, Appellant,

v.

**STATE** of Oklahoma, Appellee.

No. F–88–499.

Court of Criminal Appeals of Oklahoma.

Feb. 28, 1995.

As Corrected on Denial of Rehearing April 3, 1995.

Russell C. Miller, Sapulpa, for appellant at trial.

P. Lantz McClain, Dist. Atty., and Don I. Nelson, Asst. Dist. Atty., Sapulpa, for the State at trial.

Thomas E. Salisbury, Asst. Appellate Public Defender, Lee Ann Jones Peters, Asst. Appellate Indigent Defender, Norman, for appellant on appeal.

Susan Brimer Loving, Atty. Gen., A. Diane Blaylock, Asst. Atty. Gen., Oklahoma City, for appellee on appeal.

## OPINION

JOHNSON, Presiding Judge:

Appellant, Howard C. Marquez, was tried by jury and convicted of two counts of Murder in the First Degree, Case No. CRF–87–274, in the District Court of Creek County. The jury found the existence of aggravating circumstances on each count and recommended the punishment of death for both murder convictions. The trial court sentenced accordingly. From this judgment and sentence, Appellant has perfected this appeal.

Appellant raises twenty-six (26) propositions of error on appeal. However, we need only address four of these issues as we find error which requires reversal. Furthermore, as reversal is required, we find an extensive recitation of the facts is not necessary. Any relevant facts will be discussed in the assignment of error to which they relate.

### A. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO GRANT APPELLANT A CONTINUANCE.

Appellant's arraignment was originally scheduled for March 21, 1988 (O.R. 46). On Appellant's own motion, the arraignment was continued to April 4, 1988. Just three days prior to this arraignment date and 18 days prior to trial, the State filed the Bill of Particulars (O.R. 56). Defense counsel filed a Motion to Quash the Bill of Particulars and repeatedly requested a continuance asserting that he had not had a sufficient amount of time to properly prepare (O.R. 160–161, Tr. 3). Both request were denied.

In *Hunter v. State*, 829 P.2d 64, 65 (Okl.Cr. 1992), this Court adopted "the standard that the State must file the Bill of Particulars prior to or at the arraignment of the defendant." *Hunter* clearly stands for the proposition that notice the death penalty is being sought should be given within a reasonable amount of time prior to trial. *Id.* at 65.

In the instant case, the trial court should have granted Appellant's continuance requests as the State's notice was inadequate. Defense counsel was a sole practitioner. In less than a years time, he had been court appointed to represent defendants in three separate death cases. This was the third death case he had tried in approximately a six month period. Defense counsel repeatedly requested a continuance asserting that he had not had a sufficient amount of time to interview witnesses and prepare for trial. Even under the best of circumstances, it would not be possible to properly prepare to defend a death penalty case in 18 days time.

The trial of a case, especially a death case, is not a game. Even in a clear-cut case such as this, the defendant is entitled to a fair trial; eighteen (18) days is not enough time to prepare and, therefore, not fair. The District Attorney should have filed the Bill of Particulars when he *knew* he was going to ask for the death penalty. The trial judge should have granted the continuance. Consequently, under the circumstances of this case, we find the trial court abused its discretion when it failed to grant Appellant's request for a continuance.

## B. THE TRIAL COURT ERRED BY ADMITTING STEPHANIE ROBINSON'S HEARSAY STATEMENTS.

During the evening of December 11, 1987, Steven L. and Virginia L. "Lee" Robinson were killed in their mobile home near Oilton, Oklahoma. The victims lived in the mobile home with their three children. Two of the victim's children, Dustin and Stephanie, were present in the house at the time of the murders. Although Dustin slept through the entire incident, Stephanie was a witness to the brutal murders. After the assailant left, Stephanie tried to wake her brother. Unable to do so, she went to sleep in the hallway by him.

The victims' bodies were discovered the next morning by Russell Rickner after Steve Robinson had failed to show up for work. Stephanie was still asleep when he arrived. After discovering the bodies, Rickner drove the Robinson children back to their grandfather's farm. During the drive, Stephanie told Rickner "a bad man came and did this" and "he looked like Yvonne's husband" (Tr. 491).

Law enforcement officers investigated the crime scene during the morning of December 12, 1987. Shortly after noon, Sheriff Whitworth and Undersheriff Denton went to Leo Robinson's farm to interview Stephanie Robinson about the deaths of her parents. The interview was videotaped by Whitworth while Denton asked the questions. During the interview, Stephanie went through the events of the murders twice. She specifically described the assailant as a black man with black hands, black hair, black eyes, and a black mustache. She again stated that the man looked like "Yvonne's husband" except he did not wear glasses or have a beard. The investigation revealed that Yvonne's husband was Michael Marquez, Appellant's brother.

Over strenuous objections by defense counsel, Stephanie's statements were admitted into evidence and her videotaped interview played for the jury at trial. On appeal, the State submits this evidence was properly admitted as "excited utterances" under 12 O.S.1981, § 2803(2).

Three foundational requirements must be met before hearsay evidence may be admitted into evidence under the excited utterance exception: (1) a startling event or condition; (2) a statement relating to that startling event or condition; and (3) the statement must be made while the declarant is under the stress of excitement caused by the event or condition. *McCalip v. State*, 778 P.2d 488, 490 (Okl.Cr.1989). In the instant case, the murder of Stephanie's parents was obviously a startling event and her challenged statements related to that event. The pivotal issue then is whether Stephanie's statements were made while she was under the stress of excitement caused by the murders.

In *Newbury v. State*, 695 P.2d 531 (Okl.Cr. 1985), this Court found that a four-year-old's statement to her mother the morning after a startling event was admissible as an excited utterance. The defendant in *Newbury* was charged with First Degree Murder. The

victim disappeared on the evening of August 27, 1981, while babysitting the four-year-old declarant and her ten-month-old brother. When the declarant's father returned home that night, the babysitter was gone and the children were sleeping soundly. The next morning the declarant went into a bedroom where her mother was. When her mother asked her where the babysitter went, the declarant stated, "She went with the television man." *Id.* at 536. On appeal, the Court found the statement admissible as an excited utterance. The Court reasoned that the child had not had an opportunity for fabrication or reflection as she had slept for virtually the entire time between the startling event and the statement.

Four years later in *McCalip*, 778 P.2d 488, this Court revisited this issue again. However, on this occasion the Court found the trial court erred when it admitted a two-year-old's statement to his mother the morning after a startling event. The defendant in *McCalip* was accused of Child Abuse. The charge arose out of an incident that occurred during the evening hours on October 3, 1984, while the defendant was babysitting the two-year-old victim. When the victim's mother returned home, her son was already sleeping soundly. The next morning when he came into his mother's bedroom he was walking strangely. When she asked him what was wrong, he replied "Jimmy hit me." *Id.* at 489.

Upon review, this Court found error with the admission of the declarant's statement as an excited utterance. The Court determined that the trustworthiness of an excited utterance is derived from the spontaneity of a statement when it is considered in relation to the exciting event. The Court concluded that the record did not sufficiently support a finding that the victim's statement was spontaneously volunteered. *McCalip* at 489. First, the victim's statement was made in direct response to questioning by his mother. Second, the Court found that inconsistencies in his mother's testimony cast doubt on the spontaneity of the statement. Although the Court noted that the fact the declarant had slept made it less probable that the his statement was made while he was still under the

stress of the excitement caused by the startling event, the Court's decision did not rest on this fact.

The *McCalip* decision overruled *Newbury*, 695 P.2d 531, on factual grounds only. *Paxton v. State*, 867 P.2d 1309, 1320 (Okl.Cr. 1993). The *McCalip* decision clearly demonstrates that close attention must be paid to both the timing of a declarant's statement and to the spontaneity of that statement when determining whether a declarant's statement was made while under the stress of excitement caused by a startling event. This is a factual analysis which must be done on a case by case basis.

■ Reviewing the present case in light of the *McCalip* decision, we find Stephanie's statement to Russell Rickner was properly admitted as an excited utterance. Although she had slept through the night, the record clearly demonstrates that she had not had time for fabrication or reflection. Stephanie slept until Rickner arrived at her home. When she awoke, the startling event continued to exist. In fact, she was just beginning to understand the fact that her parents were dead. Unlike the *McCalip* case, there are no inconsistencies which cast doubt on the timing of or the spontaneity of her statement. Furthermore, the record does not contain evidence which would indicate Stephanie had an incentive to falsely report what she saw. *See Paxton*, 867 P.2d at 1320. Under these circumstances, we find Stephanie's statements to Rickner rise to the level of trustworthiness intended by the excited utterance exception.

■ On the other hand, Stephanie's subsequent statements do not fall under the excited utterance exception to the hearsay rule. After arriving at her grandfather's home, a full blown criminal investigation was quickly begun. From this point forward, Stephanie's statements lacked any spontaneity, but were the direct result of the interviewing process. The fact that a child psychologist testified at the motion hearing that Stephanie appeared to be in shock when the videotaped interview was conducted has no bearing on this determination. The medical term "shock" and the legal concept of an "excited utterance" are not synonymous. The sheer fact that an

individual may medically be in shock when he makes a statement does not demand that his statement be legally recognized as an "excited utterance." Rather, all of the circumstances surrounding a statement must be factored into the determination.

█ We further find that the admission of the videotaped interview resulted in improper bolstering of Stephanie Robinson's testimony. Through the use of the videotape, the State was able to essentially present its principal witness three times, once through Stephanie's in-court testimony and twice in the videotape. While Stephanie's testimony at trial may not have been as strong as the State wished, her testimony was complete and had not been impeached. While the videotape merely repeated Stephanie's in-court testimony, this testimony was not merely cumulative. Stephanie's description of the murders in the videotape was much more vivid and riveting. Under these circumstances, the admission of the videotape clearly resulted in the improper bolstering of the State's case and was error. *See Burke v. State*, 820 P.2d 1344, 1348 (Okl.Cr.1991). Had the witness been impeached and the tape offered to show prior consistent statements that could have been a different story, but that is not before this Court.

## C. THE TRIAL COURT ERRED WHEN IT FAILED TO SUPPRESS APPELLANT'S STATEMENTS.

Shortly after being arrested, Appellant made three statements to law enforcement officers. Appellant unsuccessfully sought to suppress these statements at trial. Appellant contends these statements were inadmissible for the following reasons: (1) they were taken in violation of his right to counsel without a valid waiver; (2) they were the product of illegal police compulsion; and (3) they were made in the course and scope of plea bargaining.

In order to properly address this issue, a detailed synopsis of the events leading up to Appellant's first statement is necessary. Appellant was charged on December 14, 1987.

He was later arrested in California on December 22, 1987, and returned to Oklahoma on January 4, 1988. On either January 4 or 5, Appellant signed a pauper's affidavit requesting court appointed counsel. On January 5, Appellant appeared before Special Judge Wilson and was advised of his rights. Following the arraignment, Appellant was first interrogated on January 6, 1988. As the interrogation was video taped, there is little dispute as to the events leading to Appellant's statements. (State's Ex. 39)

The interrogation was apparently initiated because Appellant had indicated he wanted to talk with the District Attorney. Appellant was first read his *Miranda* rights and asked if he understood them. Although Appellant was never asked if he wished to waive his rights or wished to have counsel present, Appellant was asked to sign a rights waiver. The rights waiver form was not read to him, nor was he asked if he could read.[1] Thereafter, questioning was begun.

Appellant was immediately advised that he could not talk directly with the District Attorney as he would be prosecuting the case. Appellant was informed, however, that he could talk to the District Attorney through them. Shortly thereafter, Appellant asked how he could "make a deal" without a lawyer or the District Attorney being present. Deputy Fugate asked Appellant if he wanted a lawyer, to which Appellant responded, "Today?". Appellant was then advised that the trial court was in charge of appointing attorneys and that it could take a week or two weeks before counsel could be appointed. They then emphasized again that they would relay any information Appellant wanted to the District Attorney, and the interrogation was continued.

Appellant initially stated during the interview that Darren Casey must have committed the murders. He then changed his story and stated that it was a contract killing paid for by a drug dealer. Appellant stated that he was present when some "guy" named John took the contract a couple of weeks

1. It should be noted that appellant later stated during the interview that he could not read or write.

before the murders. Other than this, Appellant denied any further involvement in the murders.

■ It is settled law that "[a]n accused ... having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *See also Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); *Walker v. State,* 795 P.2d 1064, 1067–1068 (Okl.Cr.1990). If an accused does initiate further discussions with the police, the record must clearly demonstrate that the accused knowingly and intelligently waived that previously invoked right. *Walker* at 1067. Such waivers must be dealt with cautiously. Consequently, additional safeguards are necessary to insure a voluntary waiver of that right is made. *Walker* at 1068.

■ In the instant case, there can be no doubt that Appellant had asserted his right to counsel prior to the interrogation now in question. Appellant had appeared before the Magistrate and been advised of his rights and had filled out the pauper's affidavit requesting counsel be appointed, therefore, his Sixth Amendment rights had attached. Our next inquiry would normally be then who initiated the discussions with the police. *Smith,* 469 U.S. at 95, 105 S.Ct. at 493. However, such an inquiry is not necessary in this case as Appellant's statement was clearly not the result of a knowing and intelligent waiver of his previously invoked right to counsel.

Appellant in the present case was never asked if he wished to waive his rights, if he could read the waiver form, or if he understood that by signing the form he was waiving all his rights. Furthermore, Appellant was never specifically asked if he wished to waive his right to counsel until after he expressed concern regarding how he could make a deal without a lawyer. When an inquiry was made, Appellant responded "Today?".[2] In light of the fact that Appellant had already appeared before a Magistrate and requested counsel, this question should have been a red flag to the deputies to inquire further. Instead, the deputies discouraged Appellant from invoking his right to counsel by advising him it could take the trial court up to two weeks to appoint counsel.

■ Moreover, Appellant's statement was clearly the result of implied promises by the deputies. A confession is not voluntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976); *See also, James v. State,* 711 P.2d 111, 113 (Okl.Cr.1985). When confronted with this issue, we must examine the "totality of the surrounding circumstances, including the characteristics of the accused and the details of the interrogation." *Castro v. State,* 745 P.2d 394 at 403 (Okla.Crim.App.1987).

In the instant case, Appellant was advised on approximately 10 different occasions during questioning that the deputies would try to assist him in making a deal by relating information to the District Attorney. He was repeatedly asked what he wanted to deal for and what he had to deal with. In addition, he was forewarned on several occasions that if he wanted to deal, he had to give them information. He was further informed that if he told the truth and cooperated the District Attorney might not file a Bill of Particulars.

Considering the "totality of the surrounding circumstances" in this case, Appellant's

---

**2.** This Court recognizes the recent United States Supreme Court case of *Davis v. United States,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) in which the Court held only unambiguous requests for counsel will trigger the rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In this 5–4 decision, Justice O'Conner stated that "a suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Pursuant to this case, "Today?" would probably not have been sufficient enough to trigger *Edwards.* However, we find *Davis* is not applicable to the present case as appellant had already clearly invoked his right to counsel prior to the interrogation ever being initiated.

statement was not voluntarily given. He had clearly invoked his right to counsel prior to the interrogation. Once the interrogation was initiated, nothing was done to insure that Appellant knowingly and voluntarily waived his previously invoked right to counsel. As noted in *Walker,* 795 P.2d at 1068, the fact that Appellant was advised of his rights and signed a waiver form is not dispositive. Additional safeguards are necessary when an accused has already invoked his right to counsel. Such safeguards were clearly not present here. Therefore, the trial court erred when it failed to suppress Appellant's video taped statement.[3]

██ Appellant made two more statements the day after his videotaped statement was made. Each of these statements was initiated by the State. Audio tapes were made of both these statements. Appellant ultimately stated during these interviews that he was outside the Robinsons' mobile home when Darren Casey committed the murders. After hearing the shots, he stated he rushed into the mobile home. Casey then instructed him to pick up the shells and they left. They then went and dropped the gun in a river.

Prior to each of these interrogations, Appellant was read his Miranda rights. On both occasions, he agreed to waive his rights. Although the interviewing techniques used were not coercive, care was still not taken to ensure that Appellant was voluntarily waiving his previously invoked right to counsel. Consequently, we must also find that Appellant's second and third statements should have been suppressed.

### D. THE EVIDENCE WAS INSUFFICIENT TO PROVE THE MURDER OF STEVE ROBINSON WAS HEINOUS, ATROCIOUS AND CRUEL.

██ Finally, to avoid further error on retrial, we address in part Appellant's tenth assignment of error and find there was insufficient evidence for the jury to conclude that Steve Robinson's murder fit within the constitutional definition of "especially heinous, atrocious and cruel." Dr. M.F. Merchant, a

forensic pathologist, testified that Steve Robinson was shot approximately three times while asleep. The injuries caused by two of the shots could have been fatal. The shot to the chest would have resulted in death within a couple of minutes. The shot to the left side of Steve Robinson's head would have caused death nearly instantaneously. Dr. Merchant testified that he could not tell the order of any of the shots. In light of this evidence, we find the evidence presented by the State was not sufficient enough to establish the requisite torture or serious physical abuse requirement established in *Stouffer v. State,* 742 P.2d 562 (Okl.Cr.1987). *See Brown v. State,* 753 P.2d 908, 913 (Okl.Cr.1988).

### E. CONCLUSION

For the above stated reasons, the Judgment and Sentences are **REVERSED** and the case is **REMANDED** to District Court for a new trial consistent with the views expressed herein.

CHAPEL, V.P.J., and LANE and STRUBHAR, JJ., concur.

LUMPKIN, J., concurs in result.

LUMPKIN, Judge: concurring in results.

I concur in the results reached by the Court in its decision to reverse and remand this case for a new trial. However, I am concerned about generalized statements and misapplication of case authority to the facts of this case.

In the first proposition of error, the Court mistakenly seeks to apply the provisions of *Hunter v. State,* 829 P.2d 64 (Okl.Cr.1992), to the facts of this case. The issue of notice of Bill of Particulars arose in April, 1988. The Court adopted the provisions of *Hunter* in 1992 and adopted those provisions as to future cases. Therefore, *Hunter* had no retroactive application to the facts of this case.

The Court seeks to inflict some type of subjective analysis of when notification of Bill of Particulars should be made, based on when a District Attorney "knew" he was

---

3. In light of this determination, this Court need not address appellant's contention that his state-

ment was made in the course and scope of plea bargaining.

going to ask for the death penalty. I do not believe the Court truly intends to adopt such subjective methodology to determine when a Bill of Particulars should be filed as indicated by the verbiage used in the opinion. The analysis, which should be applied to the facts of this case, is whether at the time the decision was made not to grant the request for continuance, the notice of seeking the death penalty by the filing of the Bill of Particulars was "reasonable" and whether the Court abused its discretion in failing to give the defendant in this case adequate time to prepare against the seeking of the death penalty. This Court's past analysis has centered on sufficient notice to afford an opportunity to prepare a defense.

In *Hunter*, this Court sought to establish a finite time in which a Bill of Particulars must be filed in order to ensure adequate preparation prior to trial. It was deemed as to all future cases the Bill of Particulars must be filed on or before the date of formal arraignment, unless ordered otherwise by the trial court. The establishment of that finite time to allow for objective determination of whether the Bill of Particulars was filed in a timely manner in no way determined how soon the trial could be held after formal arraignment.

The facts in this case reveal the law enforcement officers emphasized the benefits of cooperation by the defendant could result in the District Attorney not filing a Bill of Particulars. These facts go to the determination of whether or not it was reasonable to deny the motion for continuance in order to prepare for the trial of a capital case within the time frame afforded. I agree that under the facts of this case, the eighteen-day period was not reasonable to allow for proper preparation.

I agree with the Court the issue relating to Appellant's statement to law enforcement officers must be analyzed based on a determination of violation of the Sixth Amendment to the United States Constitution, rather than the Fifth Amendment. Conducting my own analysis, I find the admission of these statements had an impact on the jury's verdict, and were therefore not harmless beyond a reasonable doubt. Accordingly, I concur in result.