Garry Michael CHENEY, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–94–220.

Court of Criminal Appeals of Oklahoma.

Dec. 8, 1995.

Mark Lyons, Kevin Danielson, Lyons & Clark, Tulsa, for defendant at trial.

A.J. Schultz, Sarah Day Smith, Assistant District Attorneys, Tulsa County District Attorney's Office, Tulsa, for state at trial.

Jamie D. Pybas, Assistant Appellate Defender, Capital Direct Appeals Division Oklahoma Indigent Defense System, Norman, for appellant on appeal.

Susan B. Loving, Attorney General of Oklahoma, A. Diane Blalock, Assistant Attorney General, Oklahoma City, for appellee on appeal.

## OPINION

CHAPEL, Vice Presiding Judge.

Garry Michael Cheney was tried by a jury in Tulsa County District Court, Case No. CF–93–2001, and convicted of First Degree Malice Aforethought Murder, in violation of 21 O.S.1991, § 701.7.[1] After the jury found Cheney guilty of murder, his case proceeded to the capital sentencing phase of trial to determine whether Cheney should be sentenced to life imprisonment, life imprisonment without the possibility of parole, or death. In support of its request for the death penalty, the State alleged three aggravating circumstances: (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution;[2] (2) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;[3] and (3) the murder of the victim was especially heinous, atrocious or cruel involving mental and/or physical torture.[4] The jury found only one aggravating circumstance—that the murder was committed in an especially heinous, atrocious or cruel manner—and sentenced Cheney to death. In accordance with the jury verdict, the Honorable B.R. Beasley imposed the death penalty. Cheney appealed his murder conviction and death sentence to this Court. We affirm Cheney's murder conviction; how-

---

1. Cheney also pleaded nolo contendere to Possession of a Firearm After Former Conviction of a Felony, in violation of 21 O.S.1991, § 1283. The trial court accepted his plea and imposed a ten (10) year prison sentence for the firearms violation. On appeal, Cheney does not challenge his conviction or sentence for possession of a firearm.

2. 21 O.S.1991, § 701.12(5).

3. 21 O.S.1991, § 701.12(7).

4. 21 O.S.1991, § 701.12(4).

ever, we modify Cheney's death sentence to life imprisonment without the possibility of parole because the evidence was legally insufficient to support the imposition of the death penalty in this case.

## FACTS

Shortly after 5:00 p.m. on Friday, April 30, 1993 Cheney shot and killed his wife, Margaret Cheney, in the parking garage at the Occidental Oil and Gas ("Oxy") building in downtown Tulsa. Earlier that afternoon, Cheney purchased a .45 caliber pistol and black Talon bullets from the Golden Pawn pawnshop. Several witnesses testified they saw Cheney in the parking garage earlier that afternoon.

Claudia Teipel was in the Oxy parking garage at approximately 5:04 p.m. that Friday afternoon. As she approached her car on level H of the garage, Teipel noticed a woman and a man one level up from her. The woman was spraying the man in the face with a substance that Teipel believed to be mace or a similar substance. Teipel estimated the woman sprayed the man for ten seconds. The woman's back was to Teipel and the man was facing her. The man had his hand on the woman's elbow and Teipel heard the woman saying "he-he-he-he-he."[5] Teipel did not see the man strike the woman, she did not see a gun and she did not hear the man say anything. After spraying the man in the face, the woman ran down the ramp toward Teipel's car and the man ran after her. Teipel saw the woman fall, then heard a gunshot. At that point, Teipel crouched behind her car. She could see the man standing over the woman with his arm extended and heard him fire several more shots. Teipel stated there was a pause between the first shot and the remaining shots, and estimated the pause lasted two to three

seconds. Teipel also testified the time between the first and last shot was three to four seconds. After the shots were fired, Teipel got up, ran towards the woman and concluded the woman was dead.

Gary Sheets was also in the parking garage at the time of the shooting. He testified he heard a woman scream then saw a woman run down the ramp in front of him. Sheets stated a man ran behind the woman then caught up with her. After that point, however, Sheets was unclear about what happened. Sheets said he heard a loud noise, saw the man standing over the woman, then heard more loud noises. Sheets honked his horn when he realized the man was shooting the woman. Sheets stated the man crouched down and ran towards the stairwell. Sheets estimated the whole incident lasted twenty seconds and stated the time between the first and last shot was five seconds.

Other witnesses also heard shots fired in the Oxy parking garage shortly after 5:00 p.m. that Friday afternoon. Witnesses testified they heard one shot then a pause followed by several other shots. One witness testified the time lapse between the first and last shot was four seconds; another witness testified the time lapse was five to six seconds.

In addition to these facts, the State introduced evidence that Cheney and his wife were going through a divorce at the time of Margaret Cheney's murder. In February 1993, Mrs. Cheney filed for divorce and sought a protective order limiting Cheney's contact with her.[6] Allen Smallwood, who was Mrs. Cheney's divorce attorney, testified the parties agreed to the protective order. Smallwood stated it was unlikely that such order would have been granted if Cheney had contested it because there was no direct

---

5. Vol. II Tr. at 441.

6. The protective order, which was admitted into evidence, stated:

   After 11:00 p.m. 2–11–93 Garry woke me up to continue pressuring me into giving him $15,-000 from my inheritance. I refused. He said I was torturing him so he was going to torture me. He did not allow me to sleep until 5:00 a.m. During the night he slammed the bedroom door so many times the door frame broke. He threw an empty infant carrier and large laundry basket of clothes out the bedroom door. He told me he could not wait to get an application for life insurance on my life and he was going to watch me kill myself via not taking care of myself. He has bragged to several people that he has a loaded 22 rifle in his trunk. He is bipolar and refuses treatment. He is currently in a manic phase and goes on uncontrollable rages.

evidence of physical abuse prior to the issuance of the order.

There was also evidence that Cheney went to his wife's house on March 31—one month before her death. At that time, Cheney struggled with his wife. During the sentencing phase of trial, Cheney admitted he had a gun during the March 31 incident.

On April 1, Cheney checked into Brookhaven Hospital where he was treated for manic-depression. Brookhaven released Cheney on April 16. Cheney had no contact with his wife from March 31 until April 30, when he confronted and killed her in the Oxy parking garage.

### CAN THE DEATH PENALTY BE IMPOSED IN THIS CASE?

The key question in this case is whether Cheney can be sentenced to death for the murder of his wife. The general perception is that since our state law provides the death penalty for first degree murder, anyone convicted of that crime can be (and many believe

should be) sentenced to death. This attitude is understandable given the horror of violent crime and the increasing public fear of senseless, tragic criminal acts. However, the United States Supreme Court has interpreted the Eighth Amendment to the United States Constitution to mean that the death penalty may only be imposed upon those few murderers who are deemed the worst of the worst murderers.[7] Oklahoma, like all states, is bound by the Supreme Court's interpretation of the Eighth Amendment.

In accordance with its interpretation of the Eighth Amendment, the Supreme Court requires states to employ principled, rational, non-arbitrary systems for discerning those few murderers who should be sentenced to die from the many murderers who are punished by a term of life imprisonment. To comply with this constitutional requirement, Oklahoma, like many other states, uses a two-step capital sentencing process. First, the jury determines whether the murder or murderer falls under one of the State's statutory aggravating circumstances.[8] Aggrava-

---

7. Any homicide (the killing of one human being by another) is tragic. Any first degree murder is not only tragic, it is horrible, morally reprehensible and demands retribution. But not all first degree murderers can be sentenced to death. In 1972, the Supreme Court outlawed the then-existing death penalty statutes. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The Court found these statutes allowed the jury unbridled discretion in imposing the death penalty in violation of the Eighth Amendment. Death penalty statutes around the country, including Oklahoma, were struck down. In response, states revamped their death penalty statutes. In 1976, the Court, in a series of cases, reviewed the newly-enacted death penalty statutes. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). The Court upheld those death penalty statutes channeling the jury's discretion to determine which defendants were eligible for the death penalty and, yet, allowing the jury the freedom to take into consideration the unique characteristics of each defendant and crime. *Gregg, supra; Proffitt, supra; Jurek, supra.* The Court struck down those statutes imposing a mandatory death sentence for every person convicted of first degree murder. *Woodson, supra; Roberts, supra.*

8. Oklahoma developed a list of aggravating circumstances to narrow the range of persons who might be sentenced to death from all those who are convicted of first degree murder to only those where one or more of the eight statutory aggravating circumstances exist. Oklahoma allows the jury to consider the death penalty only under the following aggravating circumstances:

   1. The defendant was previously convicted of a felony involving the use or threat of violence to the person;
   2. The defendant knowingly created a great risk of death to more than one person;
   3. The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration;
   4. The murder was especially heinous, atrocious, or cruel;
   5. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution;
   6. The murder was committed by a person while serving a sentence of imprisonment on conviction of a felony;
   7. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; or
   8. The victim of the murder was a peace officer as defined by Section 99 of Title 21 of the Oklahoma Statutes, or guard of an institution under the control of the Department of

ting circumstances are used to separate those few murder cases in which the defendant is eligible for the death penalty from the many cases in which the death penalty is inappropriate.[9] Once the jury determines that one or more aggravating circumstances are applicable to a particular case, the defendant is deemed eligible for the death penalty. However, even at this point the death penalty is not automatically applied. The jury must balance the mitigating factors surrounding the murder and the defendant against the aggravating circumstances of the crime and decide whether or not the death penalty is truly appropriate in an individual case.[10]

This system for determining who should be punished by death is confusing and difficult to apply,[11] and it has been the source of much litigation.[12] This Court is often faced with the arduous task of parsing through the facts of some horrible, tragic crime to determine whether the defendant should be eligible for the death penalty and ultimately selected to die. When it is clear that the death

penalty should not be applied in a given case, this Court must remedy that error.

In this case, there is no doubt Cheney is guilty of First Degree Murder. The evidence, as we have set forth above, clearly proved Cheney killed his wife with malice aforethought. Nonetheless, Cheney's murder of his wife—while horrible and tragic—does not qualify for the death penalty under Oklahoma's aggravating circumstances. Rather Cheney should have been, and now must be, sentenced to life in prison without the possibility of parole. An examination of the law and facts in this case make clear why this ruling is necessary and inevitable.

■ The jury in this case imposed the death penalty based solely on the especially heinous, atrocious or cruel aggravating circumstance. In the fourteenth proposition of his appellate brief,[13] Cheney alleges the evidence was insufficient to show that the murder of his wife was especially heinous, atrocious or cruel as that aggravating circumstance has been interpreted by this

Corrections, and such person was killed while in performance of official duty.
21 O.S.1991, § 701.12.

9. The Supreme Court has stated that an aggravating circumstance "must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa v. California*, —— U.S. ——, ——–——, 114 S.Ct. 2630, 2634–35, 129 L.Ed.2d 750 (1994) (citations omitted).

10. 114 S.Ct. at 2635.

11. Many people are unaware of the difficulties and subtleties surrounding this very emotional and volatile area of law. Indeed, while much has been said about the complexity of the Internal Revenue Code, our death penalty law is equally complex, tedious and full of "loopholes" and "technicalities". While we all may lament the complexities of death penalty jurisprudence, we must keep in mind that this area of the law is driven by the decisions of the United States Supreme Court. If we expect our State court judgments and sentences of death to be upheld, we must insist that those decisions be strictly complied with and that the law be applied fairly and consistently in every case.

12. Since 1976, much of the litigation in this area has centered on the semantics of several of the aggravating circumstances and whether these aggravating circumstances result in "rational and non-arbitrary" applications of the death penalty. To state that this system has many problems is to state the obvious. One Justice of the Supreme Court, Justice Harry Blackmun, who had for more than twenty years supported upholding the death penalty, finally in 1994, concluded the system was simply unworkable and stated he would thereafter vote against upholding death penalties. *Callins v. Collins*, —— U.S. ——, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting from denial of certiorari). Justice Blackmun's approach is tempting, but in the final analysis it is too easy a way out. Death penalty issues are among the most difficult issues faced by our society. But this Court has upheld Oklahoma's system and we are committed to try to make the system work irrespective of its inherent problems. In so doing, it is imperative that we apply the law of the Supreme Court and our prior case law fairly and consistently in every case.

13. In his brief, Cheney raises twenty-two propositions of error. Such lengthy briefs are standard, and often necessary, in capital cases. Many of these propositions address issues concerning the guilt-or-innocence stage of trial. These issues will be addressed later in this opinion. *See infra* 83–91.

Court and by the United States Supreme Court. He is correct.

The especially heinous, atrocious or cruel aggravating circumstance has come under close scrutiny by the Supreme Court. In *Maynard v. Cartwright*,[14] the Supreme Court found this aggravating circumstance was unconstitutionally vague under the Eighth Amendment of the federal constitution. The Court made clear that not every murder could fall under the especially heinous, atrocious or cruel aggravating circumstance and that Oklahoma must construe this aggravating circumstance so that there would be some principled way to distinguish the few cases in which this aggravating circumstance applies from the many cases in which it does not.[15]

In accordance with the concerns raised in *Maynard*, this Court has limited this aggravating circumstance to cases in which the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty.[16] "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met."[17] As to the extreme mental cruelty prong of this aggravating circumstance, "torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created."[18]

The standard for reviewing whether the State has met its burden of proving this aggravating circumstance is "whether there was any competent evidence to support the State's charge that the aggravating circumstance existed."[19] While the evidence against Cheney shows the murder of his wife was senseless and tragic, the evidence does not support the conclusion that it was committed in an especially heinous, atrocious or cruel manner.

Under our case law, serious physical abuse requires more than simply showing that the defendant shot and killed the victim, an act which by its very nature is violent.[20] *Brown*

14. 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

15. *Id.* 486 U.S. at 363, 108 S.Ct. at 1859.

16. *Perry v. State*, 893 P.2d 521, 533–34 (Okl.Cr. 1995); *Medlock v. State*, 889 P.2d 344 (Okl.Cr. 1995); *Mitchell v. State*, 884 P.2d 1186 (Okl.Cr. 1994), *cert. denied* — U.S. —, 116 S.Ct.95, 133 L.Ed.2d 50 (1995); *Hooks v. State*, 862 P.2d 1273, 1282–1283 (Okl.Cr.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); *Romano v. State*, 847 P.2d 368, 379 (Okl.Cr.1993), *aff'd,* — U.S. —, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Hayes v. State*, 845 P.2d 890, 892 (Okl.Cr.1992); *Berget v. State*, 824 P.2d 364, 373 (Okl.Cr.1991), *cert. denied*, 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992); *Battenfield v. State*, 816 P.2d 555, 565 (Okl.Cr. 1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992); *Foster v. State*, 779 P.2d 591 (Okl.Cr.1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3293, 111 L.Ed.2d 801 (1990); *Stouffer v. State*, 742 P.2d 562 (Okl.Cr.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988).

17. *Battenfield*, 816 P.2d at 565.

18. *Berget*, 824 P.2d at 373.

19. *Bryson v. State*, 876 P.2d 240, 259 (Okl.Cr. 1994), *cert. denied,* — U.S. —, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995); *see Romano*, 847 P.2d at 387.

20. *Davis v. State*, 888 P.2d 1018, 1020 (Okl.Cr. 1995) (heinous, atrocious or cruel aggravating circumstance not found where one victim received gunshot wound to head and back and other victim received two gunshot wounds to head); *Marquez v. State*, 890 P.2d 980, 987 (Okl. Cr.1995) (heinous, atrocious or cruel aggravating circumstance not found where victim, who was sleeping, was shot three times); *Booker v. State*, 851 P.2d 544 (Okl.Cr.1993) (finding evidence did not support heinous, atrocious or cruel aggravating circumstance where victim was shot once in chest and death was instantaneous); *Sellers v. State*, 809 P.2d 676 (Okl.Cr.), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Stouffer*, 742 P.2d at 563–64 (when no evidence victim was still conscious after first gunshot, evidence did not support heinous, atrocious or cruel aggravating circumstance); *Odum v. State*, 651 P.2d 703, 707 (Okl.Cr.1982) (evidence insufficient to support heinous, atrocious or cruel aggravating circumstance where victim rendered immediately unconscious from single gunshot wound to neck and died within minutes due to asphyxiation).

*v. State* [21] is illustrative. In *Brown*, the defendant and his wife had a long history of domestic violence. In September 1984, the defendant went to the police station and confessed to shooting his wife. The defendant's wife was found dead in her car on the side of the road. She had been shot seven times. A police officer testified he believed the defendant fired several shots at the victim's car causing the victim to run off the road. Some of these gunshots hit the victim. The officer stated he believed the defendant then stuck his arm in the window and shot the victim four more times. The medical examiner found that the victim was shot seven times and that two of the wounds were fatal. The medical examiner stated the victim would have died within minutes of receiving the fatal wounds, but he could not tell in what order the wounds were inflicted. This Court concluded that based on these facts this murder was not preceded by serious physical abuse.

Like the *Brown* case, Mrs. Cheney was shot and killed by her husband. There is no evidence Cheney threatened or physically harmed his wife during the initial confrontation in the garage. We do not know precisely how long this initial confrontation lasted, but it appears it lasted only a few seconds before Mrs. Cheney sprayed her husband in the face with mace and ran from him. Cheney then ran after his wife and shot her. Five of the shots were fatal and two of these shots would have rendered Mrs. Cheney instantly unconscious. There is a possibility that Mrs. Cheney was not killed or rendered unconscious by the first shot. However only two seconds elapsed before she was shot again. The medical examiner could not determine the order of the remaining shots. At most, Mrs. Cheney would have been conscious for a couple of seconds. These facts, while manifestly tragic and horrible, do not support a finding of serious physical abuse under the case law. [22]

The State argues Mrs. Cheney suffered extreme mental cruelty before her death because of the fear she must have felt when her husband confronted her in the parking garage. However, Mrs. Cheney's fear was no different than the fear suffered by the victim in *Brown* or by any other victim who is facing the prospect of death. The mental torture element is confined to cases in which the victim is terrorized for a significant period of time before death. [23] For example, in *Hawkins v. State*, [24] the defendant drowned the victim. The Court concluded the evidence did not support serious physical abuse or torture preceding death. The Court did find, however, that the defendant inflicted great mental cruelty on the victim prior to death. Hawkins kidnapped the victim and her children from a mall. As the Court noted:

> At the first possible instant Hawkins took this mother's helpless children away from her. While she was upstairs with him she could not know if they were safe. All that night while she was chained in the barn she could only imagine what might be hap-

---

21.  753 P.2d 908 (Okl.Cr.1988).

22.  Prosecutors have satisfied the serious physical abuse requirement by showing that the victim suffered numerous defensive wounds indicating that the victim was conscious and attempted to fight off her attacker, *Walker v. State*, 723 P.2d 273, 278 (Okl.Cr.1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986); *Romano*, 847 P.2d at 379; *Woodruff v. State*, 846 P.2d 1124, 1134 (Okl.Cr.), *cert. denied*, —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993); witness testimony that victim was alive and conscious at the time the physical abuse was inflicted, *McCracken v. State*, 887 P.2d 323 (Okl.Cr. 1994); or medical evidence that the victim was conscious during the infliction of serious physical injury. *Bryson*, 876 P.2d at 260.

In contrast, this Court has found the evidence insufficient to support this aggravating circumstance where there was evidence that death was instantaneous, *Booker*, 851 P.2d at 544, or where the evidence readily supported the conclusion that the victim was rendered unconscious prior to the infliction of serious physical injury or mental torture. *Perry*, 893 P.2d at 533–34; *Hayes*, 845 P.2d at 892; *Battenfield*, 816 P.2d at 565.

23.  *See Neill v. State*, 896 P.2d 537 (Okl.Cr.1994) (extreme mental cruelty shown where victims forced to watch, wait and plead with defendant prior to him killing them); *Berget*, 824 P.2d at 373 (defendant forced victim into car at gunpoint, drove around for a period of time, then put victim in trunk of car and continued to drive until they reached a deserted area where defendant forced victim to stand with his back to defendant and then shot victim in the back).

24.  891 P.2d 586 (Okl.Cr.1994).

pening to them. In the middle of the night he let her see them, only to take her away again. The next morning he dragged her away as she cried, "goodbye", to her babies. Hawkins subjected this mother to a most extreme form of mental cruelty. The facts of this case satisfy both the limiting instruction that the murder was preceded by torture, and the jury's finding that the murder was in fact heinous, atrocious or cruel.[25]

In *Hawkins*, the mental torture during the course of the kidnapping leading to the victim's murder constituted extreme mental cruelty. Here, there is no such evidence of mental torture during the brief encounter between Cheney and his wife on April 30. The State cites *Mann v. State*,[26] to argue that fright alone might be sufficient to support a finding of mental cruelty. However, in *Mann*, the victim was beaten, locked in a trunk and told she would be killed. This type of extended mental abuse before death is different from the basic fright that anyone must experience immediately prior to death. *Mann* does not stand for the proposition that fright alone is sufficient to support a finding of mental cruelty.

It is critical that this Court apply the statutory aggravating circumstances consistently. If we extend aggravating circumstances to meet the facts of each murder, then we face the very real prospect that a federal court will overturn our decision or that the Supreme Court will sustain a constitutional challenge to this aggravating circumstance once again.[27] The case of *Godfrey v. Georgia*[28] is particularly instructive on this point. In *Godfrey,* the Supreme Court found Georgia's outrageously or wantonly vile, horrible or inhuman aggravating circumstance was unconstitutionally vague because the

Georgia Supreme Court failed to apply that aggravating factor in a consistent, rational and readily discernable manner.[29]

The facts in *Godfrey* are remarkably similar to the facts in Cheney's case. Godfrey shot and killed his wife and mother-in-law. Godfrey and his wife were experiencing marital difficulties. Shortly before the shooting, Godfrey and his wife had a heated argument in which Godfrey threatened his wife with a knife and damaged some of her clothing. After this incident, Godfrey's wife left him, moved in with her mother and filed for divorce. Godfrey attempted to reconcile with his wife but she rebuffed him. One evening, Godfrey and his wife argued over the telephone. During the argument, Godfrey's wife hung up on him. At that point, Godfrey got his shotgun and went to his mother-in-law's trailer home. Godfrey peered through the window of the trailer and saw his wife, mother-in-law and daughter. He fired one shot into the trailer striking and killing his wife. He then burst into his trailer, hit his daughter with the butt of his shotgun and shot and killed his mother-in-law. Godfrey called the police and confessed to the killings. Later, Godfrey told the police, " 'I've done a hideous crime, ... but I have been thinking about it for eight years ... I'd do it again.' "[30]

The jury and trial court in Godfrey's case found the murder of Godfrey's wife and mother-in-law was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The Georgia Supreme Court affirmed. The United States Supreme Court reversed. In reversing the state court, the Supreme Court noted that earlier opinions of the state court indicated that evidence of torture or physical abuse—other than the murder itself—must be shown

---

**25.** *Id.* at 597.

**26.** 749 P.2d 1151 (Okl.Cr.), *cert. denied,* 488 U.S. 877, 109 S.Ct. 193, 102 L.Ed.2d 163 (1988).

**27.** Although many Oklahomans might favor putting Cheney to death for his crime, courts do not, and cannot, decide cases based upon public opinion polls. Courts decide cases not only upon the evidence and facts, but also upon the law— not "common sense," but the law, as established by the rulings of the United States Supreme

Court, by the Legislature and by the prior rulings of this Court.

**28.** 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

**29.** In its analysis in *Maynard v. Cartwright, supra,* the Court relied heavily on its decision in *Godfrey. Cartwright,* 486 U.S. at 363–64, 108 S.Ct. at 1859.

**30.** 446 U.S. at 426, 100 S.Ct. at 1763.

to support this aggravating circumstance. Neither the trial judge nor the state high court found the murders in Godfrey's case were preceded by torture or violence. The Supreme Court concluded that such broad application of the aggravating circumstance left the Court unable to find any discernable way to distinguish the defendant's case in which the death penalty was imposed from the many cases in which it was not.

Likewise, in Cheney's case there is no evidence of physical or mental torture prior to death, and the especially heinous, atrocious or cruel aggravating circumstance should not have been applied in this case. If we were to allow Cheney's death sentence to stand we would be committing the same constitutional error that was committed by the Georgia Supreme Court in *Godfrey,* and we would likely be rebuffed by a federal court just like the Supreme Court rebuffed the Georgia court in *Godfrey.* The State suggests that Cheney's attack on his wife on March 31 is sufficient to give rise to a finding of mental torture. However, Cheney did not form the intent to kill his wife until the afternoon of April 30. Events that occurred one month before Cheney even formed the intent to kill are not enough to support the especially heinous, atrocious or cruel aggravating circumstance.[31]

Although we must modify Cheney's death sentence, it is important to note that the "relief" we are granting does not mean Cheney is allowed to walk away from his crime or is absolved from punishment. To the contrary, Cheney will spend the rest of his life in prison, without the hope of ever being released from incarceration. Most persons who are convicted of first degree murder face this penalty. Moreover, it is incumbent on this Court to take this necessary and proper action. When this Court fails to remedy cases in which the death penalty has been imposed improperly, appeals drag out for years until a federal court eventually grants the relief that we should have granted in the first place.[32] These long delays result in unnecessary financial burdens on the State and impose tremendous emotional tolls on all parties to the case. We must not allow this to happen in the Cheney case.

Under the facts of this case, we find the evidence simply does not support the jury's finding that the murder of Mrs. Cheney was committed in an especially heinous, atrocious or cruel manner. Accordingly, Cheney's sentence of death must be modified to life imprisonment without the possibility of parole.[33]

Although we have modified Cheney's sentence of death, Cheney also raised in his brief a number of issues regarding the jury's determination of guilt. Below we review these issues and conclude Cheney's conviction should be affirmed.

### VENUE

■ In his eighth proposition of error Cheney contends the trial court should have granted his motion for a change of venue. The standard for reviewing challenges to

31. Similarly, in *Brown, supra,* there was evidence that the defendant was physically abusive towards his wife during the course of the marriage. Five months before Mrs. Brown's death, the defendant punched his wife giving her a black eye. One month before her death, the defendant punched his wife in her mouth. Nonetheless, this evidence was not considered in support of the heinous, atrocious or cruel aggravating circumstance. *Brown,* 753 P.2d at 910.

In *Moore v. State,* 809 P.2d 63 (Okl.Cr.), *cert. denied,* 502 U.S. 913, 112 S.Ct. 313, 116 L.Ed.2d 255 (1991), the Court found that the evidence did not support the heinous, atrocious or cruel aggravating circumstance. Moore shot and killed a motel desk clerk. Moore robbed the clerk and, while the clerk lay on the floor, he fired five shots into the victim's head. A month before the murder, the clerk had fired Moore from his job at the motel, and the clerk feared Moore. Al-

though the evidence revealed that the store clerk feared Moore prior to the murder, the Court did not find that fact sufficient to support the heinous, atrocious or cruel aggravating circumstance.

32. We recently have seen this happen in several cases. *See Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Banks v. Reynolds,* 54 F.3d 1508 (10th Cir.1995); *Williamson v. State,* 904 F.Supp. 1529 (E.D.Okla. 1995).

33. Because we have modified Cheney's death sentence, we need not address the remaining propositions concerning the propriety of the imposition of the death penalty. These propositions include Propositions 13, 15, 16, 17, 18, 19, 20, 21, and 22.

venue was set forth in *Coates v. State.*[34] In *Coates,* the Court established a two-prong test to determine whether a denial of a motion for a change of venue was in error. "First, prejudice may be presumed where the facts reveal that 'the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings.' "[35] If the facts do not give rise to a presumption of prejudice, the Court must then review "the entire circumstances surrounding appellant's trial to determine whether the defendant received a 'fundamentally fair' trial."[36]

In Cheney's case, there was pre-trial news coverage of the murder of his wife. In addition to detailing the crime, the news reports focused on the issue of domestic violence and the problems in the Cheney marriage. During voir dire, the jurors were asked about their knowledge of the case. About half of the jurors had heard of the case. Some of these jurors did not really remember anything about the facts of the case; other jurors stated that they did not have any preconceived notions about the case or that they could set aside their opinions. Cheney used his peremptory challenges to strike seven jurors from the venire and then waived his eighth and ninth peremptory challenges.

The media did not pervade this trial.[37] Although some of the jurors had heard of the case, these jurors affirmed they could put any preconceived notions aside. The pretrial publicity in this case does not give rise to a presumption of prejudice. Turning to the second prong of the *Coates* test, we conclude, based on the totality of the circumstances, that the pretrial publicity did not deprive Cheney of his fundamental right to a fair trial. This proposition should be denied.

## JURY SELECTION

■ In Proposition 9, Cheney argues that the trial court's refusal to conduct individual voir dire of prospective jurors deprived him of his right to a fair and impartial jury. We disagree.

■ This Court does not require individual voir dire in capital cases.[38] The decision to conduct individual voir dire rests in the trial court's discretion. Here, Cheney moved to individually voir dire the jurors but the trial court overruled the motion stating "nothing is presented to convince me that individual voir dire was necessary or appropriate in this case."[39] There is nothing in the record indicating the trial court abused its discretion. In fact, trial counsel waived his eighth and ninth peremptory challenges indicating his satisfaction with the jury. This proposition is denied.

## SUFFICIENCY OF THE EVIDENCE FOR FIRST DEGREE MURDER

In his first and second propositions of error, Cheney argues that the evidence was insufficient to sustain his conviction for first degree murder. Having carefully reviewed the record in this case, we find the evidence is sufficient to sustain the jury's finding of guilt.

Cheney admits he killed his wife in the Oxy parking garage. His defense at trial was that he was not guilty by reason of insanity, or, alternatively, that he was only guilty of the lesser offense of Manslaughter in the First Degree. In support of these defenses, Cheney called two expert witnesses to testify about his mental condition at the time of the crime. Dr. Dodson and Dr.

34. 773 P.2d 1281 (Okl.Cr.1989). *See Hawkins,* 891 P.2d at 592; *Allen v. State,* 862 P.2d 487, 490 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1657, 128 L.Ed.2d 375 (1994); *Walker v. State,* 723 P.2d at 278.

35. *Coates,* 773 P.2d at 1286, *quoting, Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589 (1975).

36. *Id.*

37. *See e.g. Allen,* 862 P.2d at 490; *Walker,* 723 P.2d at 278.

38. *Valdez v. State,* 900 P.2d 363 (Okl.Cr.), *cert. denied,* —— U.S. ——, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995); *Lambert v. State,* 888 P.2d 494, 500 (Okl.Cr.1995); *Malone v. State,* 876 P.2d 707, 711 (Okl.Cr.1994); *Trice v. State,* 853 P.2d 203, 209 (Okl.Cr.), *cert. denied,* —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

39. Vol. I Tr. at 2.

Reynolds testified Cheney suffered from bi-polar manic-depression and he had suffered from this illness for many years. Both doctors maintained that Cheney went to the garage to try to reconcile with his wife and that, if she refused him, he intended to kill himself. The doctors asserted that when Cheney was sprayed with mace something snapped and he killed his wife. Both doctors testified that at the time of the murder, Cheney could not appreciate the nature and consequences of his acts and that he could not distinguish right from wrong. Dr. Dodson also opined that Cheney should never have been released from Brookhaven Hospital and that the lithium that Brookhaven prescribed for Cheney was too low to control his manic-depression. Cheney had voluntarily admitted himself for treatment in Brookhaven Hospital on April 1st and was released on April 16th. Two weeks later he shot and killed his wife.

According to the defense doctors, after the shooting, Cheney experienced a psychogenic fugue in which he could act normally but would have no idea or recollection of what he was doing. After the shooting, Cheney drove to Kansas. When he realized what had happened, he decided to kill himself in Arkansas. As he was driving through Missouri on his way to Arkansas, the Missouri police apprehended him.

In rebuttal, the State called Dr. Wakefield, a psychologist who treated Cheney at Brookhaven. Wakefield testified that on March 31, a month before the shooting, Cheney knew what he was doing when he confronted his wife and threatened her.

The State also called Donald Perssons who occupied the cell next to Cheney in the county jail. Perssons had a Ph.D in psychology and had practiced as a psychologist for a number of years. Perssons also had been convicted of child molestation, distribution of child pornography and possession of a firearm. Perssons opined that Cheney was quite rational and that Cheney told him he

would "walk" because he would claim he was insane. Perssons' jailhouse diagnosis of Cheney was that Cheney was manic-depressive with extreme narcissistic tendencies.

In addition, the State called several lay witnesses. Among the lay witnesses was Toni Pruitt, Cheney's secretary at his former place of employment. She testified about discussions she and Cheney had about his divorce and the counseling he was receiving in connection with his divorce. Pruitt stated that on two occasions Cheney said it was stupid for Mrs. Cheney to claim he was crazy because he could kill her and get off on an insanity plea. These statements occurred a few months before Mrs. Cheney's death. Wanda Maxwell, the Cheneys' babysitter, also testified. She stated she spoke with Cheney on April 30, just hours before he killed his wife. Maxwell stated Cheney sounded fine and he made sense when he talked to her.

■ In his first proposition of error, Cheney claims the evidence was insufficient to support the jury's finding that he was sane. Under Oklahoma law, a defendant is presumed sane.[40] The defendant bears the burden of raising a reasonable doubt about his sanity.[41] "If the defendant establishes a reasonable doubt of his sanity, the presumption of sanity vanishes and it is incumbent upon the State to prove beyond a reasonable doubt that the defendant could distinguish between right and wrong at the time of the offense." [42]

Here, Cheney called two doctors who testified about his mental illness and his inability to know the nature and consequences of his acts or to know right from wrong at the time of the crime. Based on this evidence, Cheney raised a reasonable doubt about his sanity and the State bore the burden of disproving insanity beyond a reasonable doubt.

Cheney contends the State failed to disprove insanity beyond a reasonable doubt. "It is a well established rule that the question of whether the State has carried its

40. *Ballou v. State*, 694 P.2d 949, 951 (Okl.Cr. 1985); *Smith v. State*, 646 P.2d 1285, 1287 (Okl. Cr.1982).

41. *Manous v. State*, 745 P.2d 742, 744 (Okl.Cr. 1987); *Munn v. State*, 658 P.2d 482 (Okl.Cr. 1983).

42. *Manous*, 745 P.2d at 744.

burden of proving the defendant's sanity at the time of the crime is a question of fact for the sole determination of the jury and where there is any evidence tending to support its finding, it is not the province of the appellate court to weigh the same."[43] The State can disprove insanity by lay testimony as well as expert testimony, and it is within the province of the jury to disregard the medical evidence and give greater weight to the lay testimony.[44]

Here the State's lay and expert testimony supported the jury's finding that Cheney was sane at the time of the murder. Cheney focuses on the fact that none of the State's witnesses expressed an opinion about Cheney's sanity at the moment of the crime itself and that the State failed to have anyone evaluate Cheney after the crime. These omissions are not determinative. Nothing in the case law requires the State to produce expert testimony.[45] The testimony of the State's rebuttal witnesses as well as the evidence presented in the State's case-in-chief supports the jury's determination of sanity.[46] Cheney's first proposition of error is denied.

■ Relying on evidence regarding his mental illness, Cheney argues in his second proposition of error that the evidence was insufficient to support a finding that he acted with malice aforethought. Cheney contends his mental illness precluded him from forming the requisite intent for first degree murder. While there was evidence showing Cheney was mentally ill at the time of the commission of the crime, there was also evidence showing Cheney possessed the deliberate intent to take Margaret Cheney's life.[47] For example, Cheney indicated before the murder that he would use the insanity defense; he bought a gun on the day of the murder; he waited for Mrs. Cheney in the Oxy parking garage for several hours; he chased Mrs. Cheney when she ran from him; and after firing the first shot, he waited one to two seconds before firing the remaining shots.

"This Court has held repeatedly that the jury is the exclusive judge of the weight of the evidence and the credibility of the witnesses testimony."[48] "Although there may be conflict in the testimony, if there is competent evidence to support the jury's finding, this Court will not disturb the verdict on appeal."[49] Although there was a conflict in the testimony, there was competent evidence to support the jury's finding regarding Cheney's intent to kill his wife.[50] Proposition 2 is denied.

43. *Manous*, 745 P.2d at 745; *Smith*, 646 P.2d at 1287.

44. *Ballou*, 694 P.2d at 951.

45. *See Munn*, 658 P.2d at 486.

46. Cheney cites several non-Oklahoma cases, but these cases are not persuasive. In *Stacy v. Love*, 679 F.2d 1209 (6th Cir.1982), *cert. denied* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982), the State presented no evidence to rebut the defendant's evidence of insanity. In *Ex parte Turner*, 455 So.2d 910 (Ala.1984), the evidence of insanity was substantially undisputed by the State. In *People v. Lee*, 29 A.D.2d 837, 287 N.Y.S.2d 607 (N.Y.App.1968), the court found one answer to one hypothetical—which contradicted the otherwise unrefuted testimony of three expert witnesses—was insufficient to disprove insanity. Here, the State offered several lay and expert witnesses and other evidence to disprove the defense claim of insanity. The jury's verdict should not be disturbed. Finally, Cheney cites *State v. Green*, 643 S.W.2d 902 (Tenn.Crim.App. 1982). *Green* concerned Tennessee's standards for reviewing sufficiency of evidence in cases involving a question of insanity and is not applicable here.

47. *Huckaby v. State*, 804 P.2d 447, 452 (Okl.Cr. 1990) ("Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof").

48. *Woodruff*, 846 P.2d at 1134. *See Hollan v. State*, 676 P.2d 861, 864 (Okl.Cr.1984).

49. *Woodruff*, 846 P.2d at 1134.

50. Cheney also cites *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). *Enmund* concerned the propriety of the death penalty for a defendant who neither killed nor intended to kill the victims, but simply aided and abetted in a robbery during the course of which the victims were killed. Because Cheney's death sentence has been vacated, the concerns raised in *Enmund* are no longer at issue here. Moreover, Cheney's case is distinguishable from *Enmund* because Cheney killed his wife and the evidence supported a finding of malice aforethought.

### FIRST STAGE EVIDENTIARY ISSUES

In Proposition 6, Cheney contends his conviction should be reversed because of the admission of other crimes evidence during the first stage of trial. There were two types of other crimes evidence elicited during first stage: (1) evidence that Cheney lied on the Alcohol, Tobacco and Firearms ("ATF") form he filled out to purchase the weapon used to kill his wife; and (2) evidence of prior altercations between Cheney and his wife.

Other crimes evidence is not admissible as proof of character but "may ... be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." [51] The State contends in this case that the other crimes evidence at issue was relevant to show intent or motive.

■ With respect to Cheney's misrepresentations on the ATF form, the trial court allowed this evidence to be admitted to show Cheney's state of mind on the day of the murder. Such evidence was relevant to rebut Cheney's claim that he was insane at the time of the commission of the crime. This evidence, admitted for the purpose of showing Cheney's state of mind and to rebut an insanity defense, was proper.

■ Cheney also complains about evidence regarding prior altercations with his wife. Specifically Cheney complains about the ad-

mission of evidence regarding (1) the protective orders issued during the divorce proceedings limiting Cheney's ability to contact his wife; and (2) the confrontation between Cheney and his wife that occurred on March 30–31.

■ Where one spouse commits a crime against the other spouse, evidence of protective orders issued against the offending spouse may be admissible to show motive, malice or intent where intent is an issue. [52] Evidence of violations of protective orders [53] and prior altercations between spouses is relevant to show hostility, intent, motive or malice. [54]

Here, evidence of the protective order and the March 31st incident was admissible and relevant to establish intent and motive. In addition, this evidence was relevant and admissible to rebut the claim that Cheney was insane at the time of the commission of the crime. Although the protective order and the March 31st incident involved conduct occurring in the months preceding the killing, Cheney's intent, knowledge, awareness and understanding of his behavior on these prior occasions provided circumstantial evidence relevant to the questions of intent and sanity on April 30. [55] As this evidence was admissible, the prosecutor's comments during closing argument regarding this evidence do not constitute error.

51. 12 O.S.1991, § 2404(B). *See Coates v. State,* 773 P.2d 1281 (Okl.Cr.1989).

52. *Rowland v. State,* 817 P.2d 263, 267 (Okl.Cr. 1991) (evidence of victim's protective orders was relevant to show intent).

53. *Id.; Holt v. State,* 774 P.2d 476, 478 (Okl.Cr. 1989) (violation of victim protective order admissible to show motive).

54. *See Hooker v. State,* 887 P.2d 1351, 1359–60 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 164, —— L.Ed.2d —— (1995) (defendant's prior attack on estranged wife was admissible); *Duvall v. State,* 825 P.2d 621, 626 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992) (ill feeling, threats, or similar conduct by one spouse toward another in a marital homicide case is admissible and relevant); *Holt v. State,* 774 P.2d 476, 478 (Okl.Cr.1989) (violation of victim protective order admissible to show motive); *Lamb v. State,* 767 P.2d 887, 890

(Okl.Cr.1988) (prior incidents where husband attacked wife was properly admitted in marital homicide case); *Brown v. State,* 753 P.2d at 911 (testimony by wife/decedent's two children concerning husband/appellant's pointing gun at wife was probative of appellant's motive and/or intent); *Villanueva v. State,* 695 P.2d 858 (Okl.Cr.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985) (prior altercation between husband and wife was relevant to show malice); *Manning v. State,* 630 P.2d 327, 330 (Okl.Cr. 1981) ("[i]n marital homicide cases, a statement showing ill-feelings, threats or similar conduct by one spouse towards the other is relevant to show motive or malice"); *Wadley v. State,* 553 P.2d 520, 523 (Okl.Cr.1976) (in marital homicide cases evidence relating to "ill-feeling, ill-treatment, jealousy, prior assaults, personal violence, threats, or any similar conduct or attitude by the husband toward the wife" is admissible to show motive and malice).

55. *See generally Kiser v. State,* 782 P.2d 405, 407 (Okl.Cr.1989).

In his seventh proposition of error, Cheney contends the trial court erred in permitting Donald Perssons to give improper, irrelevant, and prejudicial opinion evidence. For the reasons stated below, we find that the trial court did not commit reversible error in its rulings on Perssons' testimony.

The State called Donald Perssons to rebut Cheney's evidence that he was insane at the time of the crime. Perssons had a Ph.D. in psychology and had practiced psychology for approximately twenty years. Perssons also had been convicted in Utah for (1) sexual abuse of a child, (2) sexual exploitation of a minor, and (3) providing harmful materials to a minor. He was convicted in federal court for interstate transportation of child pornography and was convicted in federal court in Tulsa of possession of a firearm by a fugitive. While Cheney was incarcerated in Tulsa County jail, Perssons occupied the cell next to him.

Perssons testified about his observations and opinions concerning Cheney's mental condition. The prosecutor elicited (or at least attempted to elicit) the following from Perssons: (1) The prosecutor asked Perssons if Cheney indicated he was suicidal. Perssons testified he did not think Cheney was suicidal. Cheney objected to this comment as non-responsive, and the judge sustained the objection. (2) The prosecutor asked if Perssons made a determination whether Cheney was suicidal, Cheney objected that the question called for a conclusion beyond his expertise, and the trial court sustained the objection. (3) The prosecutor asked if Perssons made a determination about Cheney's personality, Cheney objected, and the trial court sustained the objection. (4) Perssons testified about his conversations with Cheney and Cheney's comment that he was going to plead insanity and that he thought he could do it. When Perssons opined that Cheney was "quite rational," Cheney objected, and the trial court sustained the objec-tion. (5) Later during direct examination, the prosecutor again asked Perssons if he made a determination about Cheney's personality type. Perssons said he "diagnosed him as manic depressive with extreme narcissistic tendencies." [56] Cheney did not object to this testimony. (6) The prosecutor asked if narcissistic tendencies could be treated with medication. Cheney objected that Perssons was not qualified to answer the question and the trial court sustained the objection. (7) After the prosecutor laid a foundation, Perssons testified that narcissistic tendencies can be treated through psychotherapy, particularly group therapy. There was no objection to this testimony. (8) At the end of the direct examination, the prosecutor asked Perssons if he had any indication whether Cheney knew right from wrong. Cheney objected and the trial court sustained the objection.

On appeal, the only testimony to which Cheney objects is Perssons' testimony that he diagnosed Cheney "as manic depressive with extreme narcissistic tendencies." Since Cheney did not object to this question at trial, review is limited to plain error.

In cases in which the defendant's sanity is at issue lay witnesses, "after testifying to the act, conduct and appearance of the defendant, may state whether such acts, conduct and appearance impressed him as being rational or irrational." [57] "However, a lay witness is not permitted to give an opinion calling for a medical diagnosis." [58] Before a witness can testify as an expert, he must be qualified as an expert.[59] Here, the State did not offer Perssons as an expert in the field of psychology and the trial court never ruled on his qualifications as an expert. It appears, therefore, that Perssons was testifying as a lay witness and it was error for Perssons to testify about his medical diagnosis of Cheney, i.e. that Cheney was manic-depressive with narcissistic tendencies. However, Cheney did not object to this testimony and similar testimony was elicited from other expert wit-

56. Vol. IV Tr. 951.

57. *Doyle v. State*, 785 P.2d 317, 322 (Okl.Cr. 1989). *See Lac Coarce v. State*, 309 P.2d 1113, 1117 (Okl.Cr.1957); *Rice v. State*, 80 Okl.Cr. 277, 158 P.2d 912, 917 (1945).

58. *Doyle*, 785 P.2d at 322.

59. *Marr v. State*, 741 P.2d 884, 886 (Okl.Cr. 1987).

nesses testifying as trial. At most, this evidence was merely cumulative and does not rise to the level of plain error. Accordingly, we decline to grant relief based on this proposition of error.

■ In Proposition 10, Cheney argues the trial court abused its discretion in admitting Exhibit 3, which was a photograph of Mrs. Cheney lying on the garage floor shortly after she had been shot. Cheney contends that the photograph was unnecessary as he had admitted shooting his wife.[60]

■ A trial court's decision to admit photographs of the murder victim will be upheld unless its decision constitutes an abuse of discretion.[61] Exhibit 3 accurately depicted Mrs. Cheney's dead body at the murder scene and corroborated the testimony of the medical examiner and the eyewitnesses. The probative value of the photograph outweighed its prejudicial effect and the trial court did not err in admitting it. Cheney's case is distinguishable from *Sattayarak v. State*,[62] and *Oxendine v. State*.[63] Both involved post-autopsy photographs of the victim. Exhibit 3 was not a post-autopsy photograph. Similarly, Cheney's case is distinguishable from *Jones v. State*,[64] and *Tobler v. State*,[65] which concerned photographs of a decomposed body. Mrs. Cheney's body was not in a state of decomposition; rather, the photograph accurately depicted Cheney's handiwork and was properly admitted into evidence. We decline to grant relief based on this proposition of error.

## PROSECUTORIAL MISCONDUCT

■ In his eleventh proposition of error, Cheney alleges the prosecutor engaged in a number of incidents of misconduct during both stages of trial. We will only consider those incidents occurring during the first stage of trial, as we have already granted sentencing relief to Cheney.

We have reviewed all of Cheney's allegations of prosecutorial misconduct and found many of them to be without merit. However, on several occasions the prosecutor did overstep the bounds of proper argument and examination of witnesses. The prosecutor's conduct was improper and raises serious concerns for all parties to the case. Not only is it disturbing to see a prosecutor flout the law and ignore the direct and explicit rulings of the district court, but also it is reckless for a prosecutor to inject potentially reversible error into a trial by committing acts of misconduct. In this case, although some of the prosecutor's statements are troubling, we find, consistent with other decisions of this Court [66] and the overwhelming evidence in Cheney's case, that such errors are not sufficient to warrant relief. Accordingly, this proposition of error is denied.

## FIRST STAGE JURY INSTRUCTIONS

In propositions 3, 4 and 5, Cheney objects to certain first stage jury instructions. We find these jury instructions were proper and relief is not warranted.

In Proposition 3, Cheney relies on *Johnson v. State*,[67] to argue that Jury Instruction 22 was defective. Instruction 22 mirrored the standard OUJI–CR instruction defining insanity under Oklahoma law, and we find the instruction given to the jury in this case to be proper.

60. Cheney also complains about the introduction of Exhibit 53 during the second stage of trial. However, because we have found that we must modify Cheney's death sentence we need not address other issues pertaining to the second stage of trial.

61. *McCormick v. State*, 845 P.2d 896, 898 (Okl. Cr.1993).

62. 887 P.2d 1326, 1330 (Okl.Cr.1994).

63. 335 P.2d 940, 943 (Okl.Cr.1958).

64. 738 P.2d 525, 528 (Okl.Cr.1987).

65. 688 P.2d 350, 355–56 (Okl.Cr.1984).

66. *Cunningham v. State*, 748 P.2d 520, 522 (Okl. Cr.1987) ("When comments are based upon facts not introduced into evidence, or, as here, are minor misstatements of facts entered into evidence, we review the totality of the evidence to determine whether the remark could have affected the outcome of the trial"); *see also Moore v. State*, 714 P.2d 599, 601 (Okl.Cr.1986); *Pannell v. State*, 640 P.2d 568, 572 (Okl.Cr.1982).

67. 841 P.2d 595 (Okl.Cr.1992).

Oklahoma uses the *M'Naghten* test to determine the issue of sanity at the time of the crime. This Court has held that the *M'Naghten* insanity test, as applied in Oklahoma, has two prongs.[68] Under the first prong, the defendant is considered insane if he is suffering from a mental disability such that he does not know his acts are wrong and he is unable to distinguish right from wrong with respect to his acts.[69] Under the second prong, the defendant is considered insane if suffering from a disability of reason or disease of the mind such that he does not understand the nature or consequences of his acts or omissions.[70] The defendant need only satisfy one of these prongs in order to be found not guilty by reason of insanity.

In *Johnson,*[71] the Court reversed the defendant's conviction because a defective jury instruction required the defendant to satisfy both prongs of the *M'Naghten* test in order to be found not guilty by reason of insanity. Unlike the defective instruction in *Johnson,* Instruction 22 did not require the jury to find both prongs of *M'Naghten* in order to find insanity. To the contrary, Instruction 22 accurately reflected Oklahoma law and the jury was properly instructed on this issue. This proposition is denied.

In Proposition 4, Cheney complains the trial court erred by failing to instruct the jury on the lesser offense of second degree murder. Cheney did not request this in-

struction at trial, thus we review for plain error only.

Second degree murder was not suggested by the facts of this case. Second degree murder is murder that results from conduct that is imminently dangerous to another but which "is not done with the intention of taking the life of or harming any particular individual."[72] Here, Cheney's conduct was directed specifically at his wife. The trial court did not err in not giving the second degree murder instructions *sua sponte.*[73]

In his fifth proposition of error, Cheney contends the first degree heat of passion manslaughter instructions given in this case should have instructed the jury that adequate provocation was to be viewed subjectively from the circumstances of the defendant rather than from the view of a hypothetical reasonable man. Essentially, Cheney urges this Court to adopt the Model Penal Code standard for determining whether adequate provocation exists to warrant a finding of First Degree Manslaughter. We decline to adopt this standard and find that the reasonable person standard does not violate Cheney's right to due process.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In his twelfth proposition of error, Cheney contends he was denied effective assistance

---

68. *Pugh v. State,* 781 P.2d 843, 843 (Okl.Cr. 1989).

69. *Id.* at 843–44.

70. *Id.* at 844.

71. 841 P.2d at 596.

72. *Palmer v. State,* 871 P.2d 429, 432 (Okl.Cr. 1994).

73. Cheney also relies on *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), to argue that failure to provide these instructions deprived the jury of the ability to impose a non-capital third option supported by the law and evidence. Cheney's argument is not persuasive. In *Beck,* the Court reversed the defendant's conviction and death sentence because Alabama law prohibited the trial court from giving the jury a lesser-

included offense instruction even though the evidence warranted the instruction. Further, the Alabama death penalty statute required the jury to sentence the defendant to death upon finding the defendant guilty of the capital offense. If the jury found that the defendant committed a violent crime but did not want to impose the death sentence the only option was to release the defendant. However, as the Court made clear in *Schad v. Arizona, Beck* does not compel the trial court to provide lesser-included offense instructions where such instructions are not supported by the evidence. In *Schad,* the Court stated its primary concern in *Beck* was the all-or-nothing effect of the state rule that the jury could only find the defendant guilty of capital murder and impose the death penalty or the jury had to find the defendant innocent. In Cheney's case, however, the jury had the option of imposing life, life without parole or death. The jury also had the option of the lesser included offense of first degree manslaughter. The all-or-nothing concerns raised in *Beck* are not at issue here.

of counsel because his trial counsel (1) failed to use all peremptory challenges and failed to excuse certain jurors for cause; (2) failed to request second degree murder instructions and a limiting instruction on other crimes evidence; (3) failed to object to the rebuttal evidence of Toni Pruitt and Dr. Wakefield; and (4) failed to object to certain instances of prosecutorial misconduct. We disagree.

In *Strickland v. Washington*,[74] the Supreme Court laid out the well-known test for ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[75]

▮▮▮▮ Here, trial counsel was not ineffective. Counsel's jury selection decisions appear to be reasonable trial strategy. None of the jurors who served on Cheney's jury appear to be unqualified and there appears to be no prejudice to Cheney based on trial counsel's jury selection strategy. Moreover, the facts in this case do not suggest second degree murder, and counsel did not err in failing to request such an instruction. Regarding the failure to request a limiting instruction on the other crimes evidence, it probably would have been prudent for trial counsel to have requested such an instruction. However, this omission does not appear to have prejudiced Cheney and is not sufficient to warrant relief.

▮▮▮▮ Further, counsel was not ineffective for failing to object to rebuttal witnesses as those witnesses were properly called by the State. Since Pruitt was a rebuttal witness, the prosecutor was not required to endorse her on the Information.[76] On appeal, Cheney contends trial counsel should have requested a continuance because he was surprised by Pruitt.[77] However, whether or not to request a continuance at that point appears to be a reasonable trial strategy that did not prejudice Cheney. Additionally, it does not appear that counsel could have successfully challenged Dr. Wakefield on the grounds of privilege,[78] and counsel did not err in failing to object to his testimony.

Finally, with regard to the improper argument, we concluded earlier that the prosecutor's comments were not sufficient to warrant relief. Trial counsel was not ineffective for failing to object to these comments. Accordingly, this proposition is denied.

Having found none of the issues raised concerning the guilt-and-innocence stage of the trial warrant relief, we affirm Cheney's conviction for First Degree Murder.

### DECISION

The judgment of the district court is **AFFIRMED** and the sentence of death is **MODIFIED TO LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE.**

---

**74.** 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

**75.** *See Wilhoit v. State*, 816 P.2d 545, 546 (Okl. Cr.1991) (in making ineffective assistance of counsel claim, defendant "must be able to establish 1) that counsel's assistance was not reasonably effective, and 2) that his deficient performance denied the defendant a fair trial and that but for counsel's deficient performance, the result of the trial could possibly have been different").

**76.** *Wooldridge v. State*, 659 P.2d 943, 947 (Okl. Cr.1983).

**77.** *Id.*

**78.** 12 O.S.1991, § 2503(D)(3) states:
[There is no] privilege under this Code as to a communication relevant to the physical, mental or emotional condition of the patient in any proceeding in which the patient relies upon that condition as an element of his claim or defense . . .

JOHNSON, Presiding Judge: concurs in part/dissents in part.

I concur with the majority herein as it relates to the finding of guilt. I would also affirm the jury's verdict as it relates to the death sentence. I would not modify the sentence to life imprisonment without the possibility of parole.

If I were a juror, I might not impose the death sentence in this case. You must give deference to the jury and their verdict based upon our prior case law. Our Court has held that when there is a sufficiency of the evidence question, the State is entitled to have the evidence reviewed in the light most favorable to it. *Spuehler v. State,* 709 P.2d 202 (Okl.Cr.1985). That is clearly the case herein. There is adequate evidence to find the aggravating factor.

The question presented is was there serious physical abuse and/or torture. I believe both are here. The deceased was separated from her husband, had a victim's protective order and armed herself with mace. In other words, she had done everything she could to protect herself and yet her life was taken. She was shot six or seven times, although rapid fire, from a .45 caliber weapon. There is no question as to the defendant's premeditated crime. The evidence from the jury's standpoint could clearly allow them to find that the victim was shot once in the back, fell on her back, and was looking up at the defendant when he came and emptied the gun into her. This clearly shows physical abuse and torture. There was conscious physical suffering and our Court has never put a time limit to this. *Nuckols v. State,* 805 P.2d 672 (Okl.Cr.1991).

Again, without outlining all of the evidentiary points, the jury could have found torture herein. The deceased had obtained a VPO, it is clear that she was scared to death and, in fact, her death did occur. There was a struggle at the car, witnesses heard a woman in fear, she sprayed her estranged husband's face with mace, and there was past evidence of a history of physical abuse. The jury could have clearly found that the deceased was in great fear for her safety.

It is not for the Court to substitute its judgment for that of the jury. Therefore, I would find that the jury made a proper verdict and would affirm both the judgment as it relates to guilt and the jury sentence of death.